**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

LESTER I. GONZÁLEZ-SANTIAGO,

    Plaintiff,

      v.

BAXTER HEALTHCARE S.A., <u>ET AL.</u>,

    Defendants.

CIVIL NO. 16-2929 (PAD)

**OPINION AND ORDER**

Delgado-Hernández, District Judge.

      Baxter Healthcare S.A. terminated the employment of Lester I. González-Santiago for having intentionally used the corporate credit card to purchase tires for his personal vehicle in violation of company policy and lying during the ensuing investigation in an attempt to cover up the misconduct. Disagreeing with the decision, he initiated this action against Baxter and his former supervisor, José Rodríguez, claiming entitlement to recovery of emotional, economic, punitive, and liquidated damages, severance pay, prejudgment interest, costs, and attorney's fees under the Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. §§ 4301 <u>et seq.</u> ("USERRA"), and Puerto Rico law.[1] Upon conclusion of discovery, all parties moved for summary judgment (Docket Nos. 40 and 42). On September 30, 2018, the court granted defendants' motion and denied plaintiff's motion (Docket No. 62). Following are the grounds for the court's decision.[2]

---

[1] To wit, Law 62 of June 23, 1969, P.R. Laws Ann. tit. 25, §§ 2001-2813 ("Law 62"); Law 80 of May 30, 1976, P.R. Laws Ann. tit. 29, §§ 185a-185m ("Law 80"); Law 100 of June 30, 1959, P.R. Laws Ann. tit. 29, § 146 <u>et seq.</u> ("Law 100"); Law 115 of December 20, 1991, P.R. Laws Ann. tit. 29, § 194 <u>et seq.</u> ("Law 115"); and Law 203 of December 14, 2007, P.R. Laws Ann. tit. 29, §§ 735-743 ("Law 203").

[2] In preparing this Opinion and Order, the court reviewed the record anew.

González-Santiago v. Baxter Healthcare S.A., *et al.*
Civil No. 16-2929 (PAD)
Opinion and Order
Page 2

Based on those grounds, the case must be, and is hereby DISMISSED.  To facilitate review, a table of contents is included in Appendix I.[3]

## I.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ. P. 56(c).  A factual dispute is genuine "if the evidence is such that a reasonable jury could returned a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  It is "material" if it potentially affects the outcome of the suit under governing law.  Id.

All reasonable factual inferences must be drawn in favor of the party against whom summary judgment is sought.  See, Shafmaster v. U.S., 707 F.3d 130, 135 (1st Cir. 2013)(so noting).  To resist summary judgment, however, the nonmovant must do more than show some metaphysical doubt as to a material fact.  See, Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)(articulating proposition).  Conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative, do "not suffice to ward off a properly supported summary judgment motion."  Nieves-Romero v. U.S., 715 F.3d 375, 378 (1st Cir. 2013).

Cross-motions for summary judgment do not alter the summary judgment standard, "but instead simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on the facts that are not disputed."  Wells Real Estate Inv. Trust II v. Chardon/Hato

---

[3] Nothing in this Opinion and Order should be interpreted as detracting from the respect due plaintiff as someone who has served in the armed forces of the United States.

Rey Partnership, S.E., 615 F.3d 45, 51 (1st Cir. 2010). Although each motion for summary judgment must be decided on its own merits, each motion need not be considered in a vacuum. Id. Where, as here, cross-motions for summary judgment are filed simultaneously, or nearly so, the court ordinarily should consider the two motions at the same time, applying the same standards to each motion. Id. Applying these parameters, careful record review shows absence of genuine factual dispute as to the facts identified in the following section.

## II.   FINDINGS OF FACT

### A.  Preliminary Observations

Except as otherwise noted, the facts included in this Section are drawn from the parties' Local Civil Rule 56 submissions, namely, Defendants' "Statement of Uncontested Material Facts in Support of Motion for Summary Judgment" (Docket No. 40-2) (32 pages); "González's Statement of Uncontested Material Facts in Support of Motion for Partial Summary Judgment" (Docket No. 42-1) (10 pages); "Defendants' Opposition to Plaintiff's Statement of Uncontested Material Facts in Support of his Motion for Partial Summary Judgment" (Docket No. 44-1) (32 pages); "Plaintiff's Response in Opposition to Defendants' Statement of Uncontested Material Facts in Support of Motion for Summary Judgment and Proposed Statement of Uncontested Material Facts" (Docket No. 47) (86 pages); "Defendants' Reply to Plaintiff's Opposing Statement of Facts to Defendants' Motion for Summary Judgment" (Docket No. 56-1) (181 pages); and "Plaintiff's Reply to Defendants' Opposition to Plaintiff's Statement of Uncontested Material Facts in Support of his Motion for Partial Summary Judgment" (Docket No. 58-1) (45 pages), and the exhibits attached to these materials.

Local Civil Rule 56 is designed to "relieve the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute." CMI Capital Market Investment, LLC v. González-Toro, 520 F.3d 58, 62 (1st Cir. 2008). In this manner, it requires a party moving for summary judgment to accompany its motion with a brief statement of facts, set forth in numbered paragraphs and supported by specific citations to the record, that the movant contends are uncontested and material. See, Local Civil Rule 56(b) (laying down requirement). The opposing party must admit, deny, or qualify those facts, with record support, paragraph by paragraph, and may present, in a separate section, additional facts, set forth in separate numbered paragraphs. See, Local Rule 56(c) (describing procedure). If a party improperly controverts adequately supported factual statements, the court may treat those facts as uncontroverted. See, Natal Pérez v. Oriental Bank & Trust, 291 F.Supp.3d 215, 219 (D.P.R. 2018) (examining proposition). Here, the court reviewed every factual statement and counterstatement the parties submitted and included in this Opinion and Order, those facts that are relevant to the case and were incorporated in statements that comport with summary judgment principles.

Plaintiff requests that defendants' "Statement of Uncontested Material Facts in Support of Motion for Summary Judgment" ("SUMF")(Docket No. 40-2) be stricken because in his view, "it is replete with non-compliance with the requirements of Local Rule 56 and other principles governing dispositive motions procedure" (Docket No. 46, pp. 1-2, 5). Defendants' reply to plaintiff's opposing statement of facts persuasively demonstrates why plaintiff cannot succeed on this score. See, "Defendants' Reply to Plaintiff's Opposing Statement of Facts to Defendants' Motion for Summary Judgment" (Docket No. 56-1, pp. 1-150).

Plaintiff alleges that a number of statements in defendants' SUMF (Docket No. 40-2) infringe Local Civil Rule 56(b) because, to his way of thinking, they are not concise or short, and

are unduly compound, argumentative, unsupported, and vague.  See, Docket No. 47 at pp. 5, 6, 7,

8, 14, 19, 20, 23, 24, 25, 26, 27, 28, 31, 32, 40, 42, 44, 51, 54, 55, 56, 57, 59, 60, 61, 62, 63, 64,

66, 67, 68, 70, 71, 72, 73, 74, and 76, so asserting as to ¶¶ 12, 17, 18, 21, 21, 32, 41, 43, 52, 53,

57, 58, 60, 61, 68, 69, 70, 83, 84, 86, 88, 93, 96, 98, 99, 100, 104, 105, 108, 109, 113, 114, 116,

117, 118, 120, 121, 124, 125, 130, 133, 134, 137, and 140 of defendants' SUMF (Docket No. 40-

2).  In context, those statements are not vague or unsupported, and are sufficiently short, concise,

and non-argumentative to be admitted and considered at this juncture.

Plaintiff argues that several statements in defendants' SUMF (Docket No. 40-2) are

contrary to deposition testimony.  See, Docket No. 47 at pp. 5, 8, 9, 13, 16, 17, 18, 20, 21, 22, 23,

24, 25, 30, 31, 35, 36, 37, 38, 39, 40, 41, 42, 44, 45, 46, 48, 49, 51, 52, 55, 56, 57, and 59, so

arguing in connection with ¶¶ 12, 21, 22, 23, 30, 35, 36, 37, 38, 39, 43, 45, 46, 47, 48, 49, 50, 51,

52, 53, 54, 56, 57, 67, 68, 73, 74, 76, 77, 78, 81, 82, 83, 84, 87, 88, 89, 90, 93, 94, 98, 99, 100, and

101 of defendants' SUMF (Docket No. 40-2).  The record, however, shows that these statements

are not materially inconsistent with, or in conflict with the evidence that defendants alluded to as

support for the statements.

Plaintiff characterizes the declarations under penalty of perjury that defendants submitted

in support of their request for summary judgment as "self-serving."  See, Docket No. 47, pp. 13,

14, 23 (characterizing Sandra Muñoz's statement as "self-serving"); p. 16 (characterizing Eduardo

Haddock's statement as "self-serving"); pp. 16, 21, 56, 57 (characterizing Elizabeth Centeno's

statement as "self-serving"); p. 22 (characterizing Enrique Morán's statement as "self-serving").

He contends that those types of affidavits are often "suspicious" (Docket No. 47, at p. 6, n. 1; p. 8,

n. 2; p. 16, n. 3; p. 22, n. 4).

The contention overlooks the fact that a declaration under penalty of perjury is not to be excluded as "self-serving" even if it supports a party's position in the litigation. See, 11 *Moore's Federal Practice* (3d Ed.), Sec. 56.94[3], p. 56-226 (there is nothing wrong with self-serving affidavits and declarations, provided they are supported by the facts in the record and satisfy the usual requirements for affidavits and declarations). Thus, an affidavit may be self-serving, but if it contains relevant information of which the affiant has first-hand knowledge, "it is competent to support or defeat summary judgment." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 53 (1st Cir. 2000). Personal knowledge within the meaning of Fed.R.Civ.P. 56(e) and Fed.R.Evid. 602 includes reasonable "inferences from sense data as well as the sense data themselves." Palucki v. Sears, Roebuck & Co., 879 F.2d 1568, 1572 (7th Cir. 1989). The statements under penalty of perjury that defendants submitted satisfy this standard.

Shifting lenses to plaintiff's request for partial summary judgment (Docket No. 42), he alleges that "many" of his statements of material facts were not properly contested and should be considered admitted (Docket No. 58, p. 2). He claims that defendants' responses (Docket No. 44-1) to his statement of uncontested material facts (Docket No. 42-1), are unduly argumentative; are neither short nor concise; and lack specific record support and/or include cross reference to summary judgment materials in violation of Local Civil Rule 56(c) and (e) (Docket No. 58, p. 3). Properly contextualized, defendants' opposing materials are sufficiently short and concise, and not unduly compound or argumentative. Considering the record as a whole, and along this line, the cross-motion procedural setting within which the evidence has been presented and that necessarily connects defendants' summary judgment filings with their statement in opposition to plaintiff's request for partial summary judgment, all of the relevant segments of defendants' opposing

statement find adequate record support.[4]  These rulings have been accounted for in the factual

presentation that follows.  Additional objections are addressed as needed below.

### B. **The Parties**

Baxter is a multinational company dedicated to the development of vaccines, intravenous

products and other devices used in the delivery of fluids and drugs to patients, and treatments for

chronic and acute medical conditions.  See, Baxter's SUMF (Docket No. 40-2), ¶ 1.  It operates

four plants in Puerto Rico, located in the Municipalities of Aibonito, Jayuya, Guayama and Cataño.

Id. at ¶ 2.  Plaintiff worked for Baxter from 1993 to 2016.  Id. at ¶¶ 3, 5.  He steadily received

positive evaluations, salary increases and promotions, having been last promoted to

Environmental, Health, Safety and Security Manager ("EHS Manager") on November 19, 2013.

Id. at ¶¶ 4-5.  As EHS Manager, he was primarily responsible for administering the health, safety,

and security of Baxter's Aibonito plant, and for providing support to other plants in Puerto Rico

and Latin America.  Id. at ¶ 6.  His duties included supervising security operations at the plant and

maintaining its car fleet in working conditions.  Id. at ¶¶ 7-8.

### C. **Military Leaves of Absence**

Plaintiff entered the U.S. Army in 1989.  See, "González's Statement of Uncontested

Material Facts in Support of Motion for Partial Summary Judgment" (Docket No. 42-2), ¶ 1.  In

1997, he joined the U.S. Air Force, and is a Master Sergeant in the U.S. Air Force Reserve.  Id. at

---

[4] With that, in various instances, plaintiff's objections (Docket No. 58-1) to defendants' opposition (Docket No. 44-1) to the facts that he asserted in support of his motion for partial summary judgment (Docket No. 42-1) mirror objections that he presented (Docket No. 47) in response to defendants' SUMF (Docket No. 40-2).  Without being exhaustive, see, Docket No. 58-1, ¶ 32, pp. 16-23 (regarding Mr. John Frese's investigation of plaintiff's use of Baxter's corporate credit card to purchase tires for his personal vehicle) and Docket No. 47, ¶ 88, pp. 43-49 (same subject matter); and Docket No. 58-1, ¶ 38, pp. 26-28 (characterization of results of Mr. Enrique Morán's and Mr. Frese's investigations) and Docket No. 47, ¶ 93, pp. 51-52 (same subject matter).  Rulings on one set of similar objections apply to each other.

¶¶ 1, 2.  He formally requested and went out in 13 military leaves of absence.  See, SUMF (Docket No. 40-2), ¶¶ 13-14.  When a drill took place on a weekend and did not require time off from work, plaintiff would not fill out a formal leave request with the Human Resources Department and, unless he had to work on a Saturday or Sunday that coincided with a drill, he would not inform his supervisor of the drill.  Id. at ¶ 12.  If he had to work, he would verbally inform his supervisor, so that any substitution could be coordinated.  Id.  Baxter did not prohibit plaintiff from taking military leaves of absence or attending military drills or related activities.  Id. at ¶ 14.[5]  There are 13 requests for military leave of absence in plaintiff's record, from May 1994 to May 2015.  Id. at ¶ 13.  He returned from leaves and drills to the same position and salary he had before attending those activities (Docket No. 40-4, p. 154).  On several occasions, he was promoted in rank and salary a few weeks or months after returning from military leave.  See, SUMF (Docket No. 40-2), ¶¶ 17-18.

### D.  P-Card

Baxter provided plaintiff with a corporate credit card, known as a "Procurement Card" or "P-Card," which authorized certain employees to purchase work materials in amounts not exceeding $5,000 per month.  See, SUMF (Docket No. 40-2), ¶¶ 19, 24.  On December 12, 2015, plaintiff and a co-worker, Edgardo Haddock, visited a Costco store in the Municipality of Caguas, Puerto Rico, to purchase and replace tires of company vehicles.  Id. at ¶ 35.  Mr. Haddock observed plaintiff purchase a set of tires for a company vehicle and a set of "run flat" tires for his personal vehicle, a BMW X5, handing the attendant one credit card to pay for everything, which lead Mr.

---

[5] Plaintiff denies SUMF (Docket No. 40-2) ¶ 14 asserting that the record to which Baxter refers, Docket No. 40-4 at pp. 152-153 (Exhibit 2 of SUMF, pp. 30-31) does not lend support to the facts stated (Docket No. 47, ¶ 14). Nevertheless, support for Baxter's statement is found in the pages that follow, at Docket No. 40-4, pp. 31-32.

Haddock to believe that plaintiff had purchased the "run flat" tires using Baxter's credit card.  Id.

at ¶¶ 36-41.[6]

### E.  Basis for Investigation

On February 24, 2016, Mr. Haddock contacted Elizabeth Centeno, Senior Human

Resources Manager in the Aibonito plant, to inform her about the incident at Costco, as well as

issues involving other employees.  See, SUMF (Docket No. 40-2), ¶ 34.  Ms. Centeno told Mr.

Haddock the Company would start an investigation and requested that he keep the matter

confidential.  Id. at ¶ 44.  Ms. Centeno relayed Mr. Haddock's lead to Miriam Bayrón, Human

Resources Director of Caribe Operations & Quality, who in turn instructed her to contact Enrique

Morán, the Aibonito Plant Manager, which she did.  Id. at ¶¶ 45-47.  She met with Mr. Morán and

informed him of Mr. Haddock's allegations.  Id. at ¶ 47.

---

[6] Plaintiff denies SUMF (Docket No. 40-2) ¶ 41, arguing that the reference to Mr. Haddock's belief is not to a factual statement but to an alleged mental state (Docket No. 47, ¶ 41).  Yet, the so-called mental state embodies a factual account, a description of an occurrence, rationally based on Mr. Haddock's first-hand perception of relevant events. Furthermore, it is not based on scientific, technical, or other specialized knowledge within the scope of Fed. R. Evid. 702 ("Testimony by Expert Witnesses") and is helpful to determine a fact in issue.  As such, it is admissible here under Fed. R. Evid. 701.  See, United States v. Soto, 799 F.3d 68, 89-90 (1st Cir. 2015)(admitting testimony under Fed. R. Evid. 701 as it stemmed from witness' perception of what defendants were doing, it was helpful to explain why, and involved no special or technical knowledge); United States v. Vega-Figueroa, 234 F.3d 744, 754-755 (1st Cir. 2000)(appropriate to allow the witness – the sister of a woman killed by a conspiracy – to state under Fed. R. Evid. 701 that her sister was killed because she was selling more drugs than the conspirators at witness' drug point, the witness had first-hand knowledge of how drug trafficking organizations operated, she was present at a meeting when a codefendant mentioned the benefits of witness' joining his operation, and she witnessed her sister's murder); Robinson v. Bump, 894 F.2d 758, 762 (5th Cir. 1990)(in action arising from a collision with a truck, proper in light of Fed. R. Evid. 701 to permit an eyewitness to testify that the truck's driver was in total control of the vehicle until it was struck by another vehicle, for the witness personally observed the truck's movement, and the testimony was helpful in assessing whether the truck driver was negligent); United States v. Freeman, 514 F.2d 1184, 1191 (10th Cir. 1975)(in prosecution for interstate fraud scheme, bank official was properly permitted to testify that there was no doubt in his mind that appellant was selling all of his equipment, given that witness was merely giving a shorthand rendition of his knowledge of the total situation and collective facts).  Incidentally, plaintiff could not deny that Mr. Haddock was present at Costco when he made the purchase transactions in question, as he did not remember (Docket No. 40-4, p. 48).  And not recalling is "insufficient to create a genuine issue of fact."  Rivera-Flores v. Bristol-Myers Squibb Caribbean, 112 F.3d 9, 13 (1st Cir. 1997); In re Adventist Living Centers, Inc., 171 B.R. 310, 313 (N.D. Ill. 1994)(that an individual does not remember making a statement does not mean he has denied making it, and does not contradict an entity's version of the conversation where the statement was assertedly made).

### F.  **Enrique Morán's Probe**

That same day, Mr. Morán went to the plant's parking lot to visually inspect the tires of the Company's vehicles, and requested from Sandra Muñoz, General Accounting Manager at the Aibonito plant, a copy of plaintiff's P-Card statement for the month of December 2015.  See, SUMF (Docket No. 40-2), ¶¶ 48-50.[7]  Ms. Muñoz provided the statement to Mr. Morán, together with the copies of two partial receipts that plaintiff had submitted.  Id. at ¶¶ 50, 51.  The receipts contain the total of the transactions but not a description of the purchased items.  Id. at ¶ 52.  Further, Ms. Muñoz told Mr. Morán that for this reason, she had been following up with plaintiff regarding that particular statement; that incidentally, she had run into plaintiff in the parking lot earlier that day and had followed up with him again to provide her with the original receipts of the Costco purchases; plaintiff had informed her that the receipts corresponded to tire purchases, and that he had lost the original receipts and had thrown out the warranty papers, but would go to Costco to obtain new copies of the receipts.  See, SUMF (Docket No. 40-2), ¶¶ 51-55.[8]  In addition, Ms. Muñoz mentioned to Mr. Morán that during the same conversation in the parking lot, plaintiff said he was told Mr. Morán had been in the parking lot inspecting the tires of company vehicles.  Id. at ¶ 57.[9]  Mr. Morán asked Ms. Muñoz to provide him with the copies of the Costco receipts as

---

[7] Plaintiff denies SUMF (Docket No. 40-2), ¶ 49, alleging that Ms. Muñoz was not made aware of an investigation by Human Resources regarding plaintiff's Costco purchase (Docket No. 47, ¶ 49).  The objection does not, however, controvert the fact that Mr. Morán asked Ms. Muñoz for plaintiff's December 2015 P-Card statement.

[8] Plaintiff testified that he did not remember if by February 24, 2015, Ms. Muñoz had told him or asked him anything about the $1,373.59 transaction (Docket No. 42-2, p. 32).

[9] Plaintiff denied having been told that Mr. Morán was seen in the parking lot looking at the tires of company vehicles (Docket No. 42-2, p. 27).  But that is what Ms. Muñoz informed Mr. Morán, and, as will be noted later, what he in turn relayed to Ms. Centeno.

González-Santiago v. Baxter Healthcare S.A., et al.
Civil No. 16-2929 (PAD)
Opinion and Order
Page 11

soon as plaintiff gave them to her.  Id. at ¶ 56.[10]  Eventually, plaintiff handed over sales audit

transaction detail reports to Ms. Muñoz, who forwarded them to Mr. Morán.  See, SUMF (Docket

No. 40-2), ¶ 58.[11]

---

[10] In his unsworn statement under penalty of perjury, Mr. Morán relates that Ms. Muñoz informed him plaintiff submitted partial copies of two receipts for the Costco purchases that did not include the details of the transactions (Docket No. 40-16, ¶ 6), a record citation that plaintiff conclusorily objects to as hearsay (Docket No. 58-1, pp. 13, 14).  First, under Fed.R.Civ.P. 56(c)(2), a party may object that the material cited to support a fact "cannot be presented in a form that would be admissible in evidence."  The objection "functions much as an objection at trial, adjusted for the pretrial setting."  Fed.R.Civ.P. 56, Adv. Com. Notes, 2010 Amendments.  Thus, while inadmissible hearsay generally cannot be considered on a motion for summary judgment, "a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form."  Ali v. District Director, 209 F.Supp.3d 1268, 1276 (S.D.Fla. 2016).  Here, Ms. Muñoz, the purported out-of-court declarant, could assert in court what Mr. Morán has related, and did so in her deposition (Docket No. 40-8, pp. 7-10), and in her unsworn statement under penalty of perjury (Docket No. 40-7, ¶ 18), presented as part of the record in support of defendants' motion for summary judgment.  In keeping with Fed. R. Civ. P.56, the court may consider "depositions," and "affidavits or declarations," among other materials.  See, Federación de Empleados Del Tribunal General De Justicia v. Torres, 747 F.2d 35, 37 (1st Cir. 1984)(noting and applying principle).  So, the information that plaintiff has objected to is properly before the court.  See, Barr v. County of Clarion, 417 Fed.Appx, 178, 180 and n. 4 (3d Cir. 2011)(noting that even if plaintiff were correct that a letter was hearsay not fitting within any exception, hearsay statements can be considered on a motion for summary judgment if they are capable of admission at trial, and because the letter's author could testify about the substance of the letter at trial, the letter was properly considered on a motion for summary judgment); Brown v. School District of Philadelphia, 2018 WL 4489646, * 1 n. 2 (granting summary judgment while overruling hearsay objection because there was no evidence that the declarant would be unavailable to testify at trial); Ali, 209 Fed.Supp.3d at 1276 (given that Director of Consular Department could testify as to the accuracy of objected to letter, letter may be considered on summary judgment).  Second, otherwise, Ms. Muñoz' saying that plaintiff submitted partial copies of receipts refers to nonassertive conduct, not to a statement, and in consequence does not qualify as hearsay, much less as material to be excluded on that basis.  Pursuant to Fed. R. Evid. 801(c), hearsay is a statement, "other than one made by the declarant while testifying at the trial, or hearing, offered in evidence to prove the truth of the matter asserted."  Under Fed. R. Evid. 801(a), a statement is "(1) an oral or written assertion or (2) nonverbal assertion of a person, if it is intended by the person as an assertion."  In the absence of a statement, there is no hearsay.  See, United States v. Buttler, 763 F.2d 11, 15 (1st Cir. 1985)(testimony from officer that he observed a female, who was later taken into custody for possession of cocaine, driving from defendant's house not hearsay but rather nonverbal conduct not intended as an assertion); United States v. Cassano, 372 F.3d 868, 882-883 (7th Cir. 2004) reversed on other grounds, 543 U.S. 1109 (2005)(that witness testified he approached three people asking them to cash checks and the first two declined not hearsay, as in the Court's view the testimony merely described the nonassertive conduct of the men whom witness requested help cashing checks); United States v. Hernandez, 864 F.3d 1292, 1307 (11th Cir. 2017)(Coast Guard's officer's testimony that a fellow officer, who inspected a vessel  other than the one directly involved in the case, did not appear concerned during or after the inspection was not hearsay, because it referred to nonverbal conduct and nothing in the record suggested that the conduct was intended to communicate any message to the witness).  Third, along with this, Mr. Morán shared the information with Ms. Centeno, which, as indicated below, considered it as part of the decisionmaking process.  In this way, any statement would be relevant for the non-hearsay purpose of showing Ms. Centeno's motivation or state of mind, "a factor of crucial importance in wrongful discharge cases."  Hardie v. Cotter and Co., 849 F.2d 1097, 1101 (8th Cir. 1988)(statements regarding customer complaints about plaintiff's work habits admitted over hearsay objection to demonstrate state of mind of the personnel who made the decision to terminate plaintiff's employment); Doe v. Valencia College, 903 F.3d 1220, 1230 n. 8 (11th Cir. 2018)(statements to investigator and decisionmakers admitted over hearsay objection, as they were used to show the information that they considered in reaching their decisions); Smith v. Wilson, 705 F.3d 674, 678-679 (7th Cir. 2013)(Chief of Police stated

A sale audit transaction detail report is a document Costco generates when a customer cannot find or locate a receipt.  Id. at ¶ 59.  Plaintiff gave Ms. Muñoz three sale audit transaction detail reports: one in the amount of $749.19, corresponding to "LONG TRL TOUR P235/75R17," (B.F. GOODRICH TIRES), which was processed at 1:19 p.m. with transaction reference number 534600095783; a second in the amount of $1,373.59, corresponding to "LAT TOUR HP235/75R17" (MICHELIN TIRES), which was processed at 1:22 p.m. with transaction reference number 534600095784; and a third in the amount of $1,373.59, apparently consisting of a credit applied to plaintiff's P-Card on February 24, 2016 at 6:58 p.m., with transaction reference number 0007021249.  Id. at ¶ 60.[12]  All of the sales audit transactions were apparently issued by Costco between March 8th and March 9th, 2016.  Id. at ¶ 61.

---

that after plaintiff asked the department to add his tow company to the department's tow list, he asked subordinates whether they were familiar with plaintiff's reputation, and one officer told him that the neighboring town's police department suspected plaintiff of drug dealing, and another officer shared rumors that plaintiff overcharged clients, both of which statements plaintiff attacked as hearsay but the court admitted for non-hearsay purpose of explaining the Chief's subsequent actions); 4 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence (4th Ed.), Sec. 8:20, p. 121 (statements to defending parties about the claimant in a discrimination suit may be admitted to help show that defendant acted reasonably and did not discriminate because there was reason to think that the claimant was not properly performing his duties or was engaging in misconduct).

[11] Plaintiff denies SUMF (Docket No. 40-2) ¶ 58, claiming without elaboration that page 68 of Ms. Centeno's deposition, which defendants cite as support for ¶ 58, is hearsay (Docket No. 47, ¶ 58).  The only reference in page 68 to a statement made by a person other than Ms. Centeno is to a statement by Ms. Muñoz, to the effect that she confirmed she had followed up with plaintiff to give her the tire purchase receipts, a fact that Muñoz- the purported out-of-court declarant -attested to when she was deposed (Docket No. 40-8, pp. 8-9).  Additionally, the record shows Mr. Morán alluded to the follow-up to plaintiff in the report that he provided to Ms. Centeno, which as observed below, she considered in deciding to terminate plaintiff's employment.  From this perspective, the objection does not support plaintiff's denial of the fact asserted.  See, Barret v. Orange County Human Rights Com'n, 194 F.3d 341, 347-348 (2d Cir. 1999)(rejecting hearsay objection to testimony that third parties reported to witnesses that plaintiff was arrogant, difficult and obstructionist, as testimony about reports was admitted to demonstrate decisionmakers' motivation in terminating plaintiff); Schmucker v. Data-Link Systems, Inc., 1997 WL 348061, *7 (N. D. Ind. June 5, 1997)("The information reported by employees to Ms. Smith during her investigation is admissible … to show Ms. Bryant's state of mind and good faith belief that he terminated Mr. Schumaker because of his inappropriate and intimidating behavior").

[12] Plaintiff denies SUMF (Docket No. 40-2) ¶ 60, objecting without expounding on the subject, that the sales audit transaction detail reports are inadmissible hearsay, and that Mr. Morán cannot attest to their authenticity (Docket No. 47, ¶ 60).  First, plaintiff gave the reports to Ms. Muñoz as support for the tire purchases that he had made, purportedly vouching for the truthfulness of the information included in them, and hence, opening the door for the receipts to be

González-Santiago v. Baxter Healthcare S.A., *et al.*
Civil No. 16-2929 (PAD)
Opinion and Order
Page 13

Mr. Morán analyzed the sales audit transaction detail reports and obtained from Ms. Muñoz

copy of plaintiff's P-Card statement corresponding to the billing cycle ending on February 25,

---

used against him as admissions by a party opponent excluded from the definition of hearsay set in Fed. R. Evid. 801(d). See, Computer Systems Engineering, Inc. v. Qantel Corp., 740 F.2d 59, 66 (1st Cir. 1984)(a one-page document, purportedly a projected profit-and-loss statement for the second year of operations of a defendant distributor, of which the first page was missing, but that a defendant's vice president gave to plaintiff noting that it detailed the expected performance of a defendant distributor under the agreement being negotiated with the defendant, considered a non-hearsay admission by a party opponent under Fed. R. Evid. 801(d)(2)(B)); Wade v. Lane, 189 F.Supp. 661, 665 (D. D. C. 1960), *aff'd* 290 F.2d 387, 388 (D. C. Cir. 1961)(admitting against plaintiff a doctor's certificate that plaintiff submitted as part of application for a taxi license). Second, plaintiff acknowledged the details contained in the reports, including the purchase of tires in Costco on December 12, 2015 for a company pick-up truck in the amount of $749.19; the purchase of tires for his personal vehicle in the amount of $1,379.59 (Docket No. 40-4, p. 48); that he paid for the items with the P-Card (id.); and on February 24, 2016, reversed the $1,379.59 transaction that had been credited to the corporate card, and made a transaction for the same amount to his personal credit card at Costco (Docket No. 42-2, pp. 26-27, 31-32). The Costco sale audit transaction detail reports, contain the vendor's identification number; payment method (AMEX credit card); card bearer's name (plaintiff's); items purchased, amount paid; and the date and time of transaction, as well as the reversed charge (Docket Nos. 40-17, 40-18, and 40-19). Furthermore, the purchases are reflected in plaintiff's December 2015 AMEX P-Card Statement (Docket No. 40-22), and the reversed charge entered into his personal credit card included in the statement that, as indicated below, he gave to Mr. Morán (Docket No. 40-21). In this way, plaintiff adopted or expressed belief in the information included in those reports. That being so, there is no basis to exclude them as hearsay. See, Wagstaff v. Protective Apparel Corp. of America, Inc., 760 F.2d 1074, 1078 (10th Cir. 1985)(newspaper articles that defendants delivered to plaintiff's decedent containing statements pertaining to defendants' financial condition not hearsay, as they express adoption of the statements made in the articles); . Third, the information included in the reports was inserted in the report that Mr. Morán gave to Ms. Centeno, which she considered as part of the decisionmaking process. As they help show her motivation or state of mind, they are not excludable hearsay. See, Talmage v. Harris, 486 F.3d 968, 975 (7th Cir. 2007)(admitting appraisal reports over hearsay objection to show insurance carrier's state of mind in dealing with claims under fire loss policy); Cameron v. Community Aid for Retarded Children, Inc., 335 F.3d 60, 65 n. 2 (2d Cir. 2003)(decisionmaker decided to discharge plaintiff after concluding that, based on reports that she was abusive to other employees, she lacked the managerial skills for the position of Associate Director, which plaintiff unsuccessfully objected to as hearsay, as the statements in the reports were used to establish the decisionmaker's state of mind when he decided to terminate plaintiff's employment). Fourth, as for authenticity, Fed. R. Evid. 901(a) states that, "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what is proponent claims." United States v. Alicea-Cardoza, 132 F.3d 1, 4 (1st Cir. 1997). Authentication can be accomplished "without the direct testimony of either a custodian or a percipient witness." United States v. Paulino, 13 F.3d 20, 23 (1st Cir. 1994). To establish authenticity, the proponent "need not rule out all possibilities, inconsistent with authenticity, or ... prove beyond any doubt that the evidence is what it purports to be." Alicea-Cardoza, 132 F.3d at 4. Rather, the standard for authentication is one of "reasonable likelihood." Id. Rule 901 (a) is satisfied "if the court discerns enough support in the record to warrant a reasonable person in determining that the evidence is what it purports to be." Paulino, 13 F.3d at 23 (1st Cir. 1994). A document's appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances, can, in cumulation, provide sufficient indicia of reliability to authenticate it. Id. The standard of reasonable likelihood is satisfied in this case. The sales audit transaction details reports' content, including their name and information reflected in each of them, information that plaintiff confirmed and coincides with his statements of account, suffices to authenticate them. See, Paulino, 13 F.3d at 22-24 (finding customer's receipt for a Postal Service money order authentic in part because it bore the defendant's name, listed the correct apartment number and payment to the landlord, and referred to a time frame within which the drug distribution center at issue was in operation).

González-Santiago v. Baxter Healthcare S.A., *et al.*
Civil No. 16-2929 (PAD)
Opinion and Order
Page 14

2016, confirming that a credit of $1,373.59 had been issued to plaintiff's P-Card on February 24, 2016.  See, SUMF (Docket No. 40-2, ¶¶ 62, 63).[13]  After reviewing plaintiff's December P-Card statement and the sales audit transactions receipts, Mr. Morán concluded that plaintiff had made the following tire purchases at Costco on December 12, 2015: one in the amount of $749.19, corresponding to "LONG TRL TOUR P235/75R17" (BF GOODRICH TIRES), which was processed at 1:19 p.m. with transaction reference number 534600095783; and another, in the amount of $1,373.59, corresponding to "LAT TOUR HP235/75R17" (MICHELIN TIRES), which was processed at 1:22 p.m. with transaction reference number 534600095784.  Id. at ¶ 64.  With this background, on March 11, 2016, Mr. Morán called plaintiff for a meeting to discuss the tire purchases made at Costco in December 2015 and to explain the purchase.  See, SUMF (Docket No. 40-2), ¶¶ 65-66.[14]

### G.  Report

After the meeting, Mr. Morán informed Ms. Centeno of the content of the meeting and the findings and conclusions of his investigation.  See, SUMF (Docket No. 40-2), ¶ 67.  To this end, he pointed out that initially, plaintiff told him he had purchased a set of Michelin tires at a cost of

---

[13] Plaintiff denies in part SUMF (Docket No. 40-2) ¶ 62, because defendants refer as support to page nine of Ms. Centeno's deposition, which he characterizes as hearsay (Docket No. 47. ¶ 62).  The only statement the page makes use of refers to plaintiff's P-Card statement reflecting a refund of approximately $1,370.00.  But as the discussion in note 12 shows, plaintiff admitted as much, and the information was relayed to Ms. Centeno, who considered it as part of the decision-making process.  Accordingly, even though plaintiff does not elaborate on the objection, it does not support his position.

[14] Plaintiff denies in part SUMF (Docket No. 40-2) ¶ 65, for its reliance on page 72 of Ms. Centeno's deposition, which he describes as hearsay (Docket No. 47, ¶ 65).  Although there is no attempt to explain the objection further, in that page Ms. Centeno testifies that Mr. Morán called plaintiff to inquire about the transactions on his P-Card, related to the purchase of Michelin tires for his personal car (Docket No. 40-11, p. 16).  But plaintiff admitted that Mr. Morán called him for a meeting, and that during the meeting asked him to explain the December 2015 tire purchase (Docket No. 47, ¶¶ 65, 66).  In that manner, there is adequate support for the statement.  In any event, the record shows the information was shared with Ms. Centeno, who reviewed it as part of the decision-making process. As such, it is relevant for the non-hearsay purpose of showing her motivation or state of mind.

$1,373.59 for the company's Ford pick-up truck, but when he went to install the Michelin tires, Costco only had three tires of that model available and, thus, he: (1) immediately cancelled the transaction; (2) had Costco issue a reimbursement to his P-Card; and (3) in lieu of the Michelin tires, purchased BF Goodrich tires for the company's pick-up truck, which cost $749.19.  Id. at ¶ 68.

Mr. Morán told Ms. Centeno he did not deem plaintiff's explanation plausible or credible, because if he had first purchased the tires for the Ford pick-up truck, it made no sense that the transaction for the BF Goodrich tires – the tires purchased in lieu of the Michelin tires – was carried out at 1:19 p.m. – three minutes **before** the transaction for the Michelin tires – or that the receipt for the BF Goodrich tires **has an earlier sequential transaction number** than that of the Michelin tires, the transaction number for the BF Goodrich tires being 53460005783, compared with the 53460005784 transaction number for the Michelin tires.  See, SUMF (Docket No. 40-2, ¶ 68). Moreover, if the transaction for the Michelin tires was cancelled on December 12, 2015, it made no sense to Mr. Morán that the credit was not issued until February 24, 2016, with the P-Card statement for the billing cycle ending on February 25, 2016.  Id.  In addition, plaintiff could not explain why he had not notified Ms. Muñoz or the Finance Department that he had cancelled the $1,373.59 transaction for the Michelin tires and had never come up with a receipt for the credit. Id.

Mr. Morán expressed to Ms. Centeno that because of this, during the meeting he decided to call, and called the Costco Tire Center to inquire as to the transaction relating to the $1,373.59 purchase.  See, SUMF (Docket No. 40-2, ¶ 68).  During the telephone call, which Mr. Morán made in plaintiff's presence, he provided the Costco attendant with plaintiff's Costco membership number and asked to be informed of the dates and vehicles on which the tires purchased on

December 12, 2015 with plaintiff's P-Card had been installed.  Id.[15]  The attendant said that two

sets of tires were purchased on December 12, 2015 with plaintiff's P-Card: (1) a set of BF Goodrich

tires that had been installed on a Ford Pick-Up truck in December 2015; and (2) a set of Michelin

tires that had been installed on a BMW X5 on January 2, 2016.  Id.[16]  Baxter's Aibonito plant did

not have and has never had a BMW X5 in its car fleet.  Id.

 Mr. Morán pointed out that at that point, plaintiff told him that he had purchased the tires

on the BMW in February and paid with his personal credit card.  See, SUMF (Docket No. 40-2 ¶

68).  Mr. Morán asked plaintiff why he had failed to disclose the fact that he had purchased tires

for his personal vehicle on or around the dates in question at the same Costco store, to which

plaintiff replied that he should have done it but failed to do so.  Id.  Further, Mr. Morán requested

that plaintiff provide him with a copy of the installation receipt for the tires he purchased for his

BMW.  Id.

 In due course, plaintiff handed out to Mr. Morán a sales audit transaction detail report for

a transaction in the amount of $ 1,373.59 that apparently took place on February 24, 2016 at 7:02

p.m.; a sales audit transaction detail report cancelling items not sold in transaction, corresponding

to the same day that the credit in the amount of $ 1,373.59 was issued to the P-Card; and a printout

of his personal American Express statement showing a Costco transaction on February 24, 2016,

in the amount of $1,373.59.  See, SUMF (Docket No. 40-2 ¶ 68); Docket No. 40-20, p. 2.  Plaintiff,

---

[15] The call was on the speaker phone with plaintiff in Mr. Morán's office (Docket No. 40-15, pp. 19, 21).

[16] Plaintiff does not deny that the telephone conversation with the Costco attendant occurred, or that the attendant conveyed the information Mr. Morán shared with Ms. Centeno.

however, never gave Mr. Morán a copy of the installation receipt for the tires purchased for the personal vehicle. Id.

Finally, Mr. Morán remarked to Ms. Centeno that, based on the information he obtained during his investigation, he was convinced that plaintiff: (1) intentionally purchased the Michelin tires for his personal vehicle using the corporate P-Card on December 12, 2015; (2) transferred the $1,373.59 charge of the Michelin tires to his personal credit card and had Costco issue a credit to the P-Card on February 24, 2016 after he became aware that Baxter was investigating the tire purchase; and (3) lied during the course of the investigation to cover up his misconduct. See, SUMF (Docket No. 40-2, ¶ 70). Along this line, he also commented to Ms. Centeno that, on the afternoon of February 24, 2016, after he had been seen inspecting the car fleet tires in the parking lot, plaintiff visited him at his office for no particular reason, which made Mr. Morán suspicious that plaintiff had found out the Company was investigating the tire purchases, as coincidentally, plaintiff had also sought the credit to his P-Card that same evening. Id. at ¶ 69. Mr. Morán drafted a report of his investigation, including his observations and findings, which he showed to Ms. Centeno and discussed with her. Id. at ¶ 71.[17] She requested a copy of the report, and he provided it to her. Id. at ¶ 72.

## H. **John Frese's Review**

Ms. Centeno reported Mr. Morán's findings to Ms. Bayrón, who recommended contacting John Frese, Vice President of Corporate Services responsible for global security matters within Baxter, to continue the investigation. See, SUMF (Docket No. 40-2 ¶¶ 73; 74). As part of his

---

[17] Plaintiff qualifiedly admits SUMF (Docket No. 40-2 ¶ 71) but claims that the report should be characterized as a writing built on Morán's notes from his meeting with plaintiff (Docket No.47) ¶ 71). The distinction is irrelevant.

duties, Mr. Frese has conducted approximately 100 investigations regarding employees' use of

credit cards, including P-Cards. Id. at ¶ 74. Ms. Centeno reached out to Mr. Frese and gave him

all of the documentation relating to the December 2015 incident, including Mr. Morán's report so

that he could investigate and corroborate the information. Id. at ¶ 75. Mr. Frese reviewed the

documents, contacted Costco, and obtained copy of a Costco tire installation receipt bearing,

among other things, plaintiff's name, personal vehicle description, and installation date. Id. at ¶¶

76, 77.[18]

---

[18] Plaintiff denies SUMF (Docket No. 40-2), ¶ 77, challenging on hearsay grounds its reference to Ms. Centeno's
deposition testimony about an email from Mr. Frese confirming that on January 2d the Michelin tires purchased in
December 2015 with the P-Card were installed in plaintiff's car (Docket No. 40-11. pp. 18, 20); and to a Costco tire
installation receipt, which plaintiff also calls into question, describing it as an "alleged" receipt (Docket No. 47, ¶ 88).
Plaintiff makes no attempt to develop these points. First, Mr. Frese, the purported out-of-court declarant, could later
assert what his email to Ms. Centeno states, i.e. that he confirmed the tires purchased in December 2015 were installed
on plaintiff's car in January 2016, and he did so, in his unsworn statement under penalty of perjury (Docket No. 40-
23, ¶8). On why the presentation is admissible from this perspective, see, discussion in note 10. Second, this was
addressed to a decisionmaker, who considered that information as part of the decisionmaking process, thus making
the statement relevant for the non-hearsay purpose of evaluating her motivation or state of mind. See, Serrano v.
Donahoe, 2014 WL 4924434, ** 9-10 (D.P.R. Sept. 30, 2014)(email between decisionmaker and a representative of
employer's labor relations department not hearsay, as it was offered to show the decisionmaker's motive or state of
mind confirming why he made the decision in question). Third, on the subject of the receipt, the document bears
plaintiff's name, plaintiff's Costco membership number, the same item (tire) description number contained in the sales
audit transaction detail report corresponding to the Michelin tires purchased on December 12, 2015, in addition to a
description of plaintiff's personal vehicle, and the tire installation date (Docket No. 40-24), a date that coincides with
the one the Costco attendant provided to Mr. Morán during the telephone call he had with the Costco attendant in
plaintiff's presence on March 11, 2016. Thus, if by using the term "alleged" plaintiff implies that the receipt has not
been authenticated, the record shows otherwise. Fourth, with regard to the characterization of the receipt as hearsay,
receipts are not hearsay when used as "circumstantial evidence to link a defendant to a particular place, to other
defendants, or to an illegal item." 5 Weinstein's Federal Evidence (2d Ed.), Sec. 801.10[2][a], p. 801-9. The receipt
links plaintiff (Lester González), his vehicle (BMW SUV X5), and the tires purchased on December 12, 2015 (Item #
1020363, identical to the Item listed in the sales audit transaction detail report corresponding to the sale of December
12, 2015, Docket No. 40-18), to the Costco Tire Center on January 2, 2016. See, United States v. Serrano, 434 F.3d
1003, 1004-1005 (7th Cir. 2006)(defendant's driver's license and automobile insurance card not hearsay inasmuch as
they were used as circumstantial evidence linking defendant to a particular place rather than for the truth that defendant
lived at the address depicted in the documents). As the Costco attendant expressed to Ms. Morán and plaintiff on
March 11, 2016 – and Mr. Morán included in his report, a report that Mr. Frese reviewed – tires purchased under
plaintiff's membership number had been installed on a Ford Pick-up truck in December, and on a BMW on January
2, 2016. Fifth, as mentioned earlier, the information on the personal vehicle tires installation date was provided to
Ms. Centeno, and because she considered it as part of the decisionmaking process, it is relevant for the non-hearsay
purpose of showing her motivation or state of mind. See, Gomez v. Rivera Rodríguez, 344 F.3d 103, 115, 119 (1st
Cir. 2003)(reversing exclusion of testimony about legal advice given to the defendant to show the defendant's
motivation for terminating plaintiff's employment); Moore v. Sears, Roebuck and Co., 683 F.2d 1321, 1322 (11th Cir.
1982)(memoranda prepared by plaintiff's supervisors with observations involving, among other things, summaries of
reports on plaintiff's performance made by other company employees, and chronological accounts of events such as

González-Santiago v. Baxter Healthcare S.A., et al.
Civil No. 16-2929 (PAD)
Opinion and Order
Page 19

As part of the investigation, on April 14, 2016, Mr. Frese came to Puerto Rico to interview several Baxter employees, including Mr. Haddock.  See, SUMF (Docket No. 40-2 ¶¶ 78-79).  During the interview, Mr. Haddock narrated his version of the Costco incident, which Mr. Frese found credible.  Id. at ¶¶ 83,84.[19]  Also, he interviewed plaintiff in Ms. Centeno's presence.  See, SUMF.  Id. at ¶ 85.  After the interview, Mr. Frese concluded that plaintiff intentionally used the P-Card to purchase tires for his personal vehicle and reversed the transaction on February 24, 2016 to cover up his misconduct, for the following reasons.  Id. at ¶¶88.[20]

> First, Mr. Frese believed Mr. Haddock's testimony in that plaintiff had only taken out one credit card when he paid at Costco in December 2015 and offered Haddock to "buy anything he needed" prior to making the payment. During his interview, plaintiff admitted that he paid for everything with one credit card (his P-Card), when he paid on December 12, 2015.  Mr. Frese believed that his fact demonstrated that plaintiff never intended to use his personal credit card to pay for the Michelin tires.  See, SUMF (Docket No. 40-2, ¶88, p. 24). [21]

---

personnel investigations and meetings not hearsay, as they were used to establish that employer was motivated in good faith to discharge plaintiff for nondiscriminatory reason).  See also, Soto, 799 F.3d at 89 (out-of-court statement that an individual [Briggs] told witness that defendant was not an honest person not improper hearsay testimony, for it was offered to explain the witness' rationale for refusing to sign documents that a co-defendant had given her).

[19] It bears noting that Mr. Haddock's account to Mr. Frese was the same he had provided to Ms. Centeno.  See, Mr. Haddock's Deposition (Docket No. 56-4), pp. 2-4.  By that, during the deposition he was asked and answered as follows: "Q.  Can you please tell me specifically the circumstances that led you to believe that [plaintiff] used the P-Card at that time, to purchase the tires for his personal car?  A.  As I mentioned earlier, I saw only one transaction take place to purchase tires for the company vehicle, and in that transaction they included tires for his personal vehicle and I did see a card from where I was sitting, and it was a company card.  Because they were company vehicles, my understanding is that the company card would be used.  Q.  And, did not communicate your conclusion or your belief to Elizabeth Centeno when you spoke to her in February 2016?  A.  Yes.  Q.  Did you communicate this belief and the reasons therefore to John Frese when he interviewed you back in April 2016?  A.  Yes."  Id.  Likewise, he was asked and answered, "Q.  You … were you able to see that [plaintiff] gave the attendant two different credit cards?  A.  No.  Just one.  Q.  You are 100 percent sure that [plaintiff] gave only one credit card to the attendant?  A.  Yes.  Q.  And that's what you saw from ten to 12 feet behind [plaintiff, correct?  A.  Correct.  Q.  And you 're completely certain of that, correct?  A.  Yes" (Docket No. 40-12, p. 26).

[20] Plaintiff denies SUMF (Docket No. 40-2) ¶ 88, stating that Mr. Frese testified at deposition that he did not reach any "conclusions," but rather "findings."  See, OSUMF (Docket No. 47) ¶ 88.  The distinction is inconsequential.

[21] As background, during his deposition Mr. Haddock was asked and answered, "You said that at that time, [plaintiff] … told you that if you wanted to buy anything there in Costco, is that right?  A.  Yes.  … Q.  Do you remember the specific or a specific word that he used when he made you that offer?  A.  He said to me, do you need anything else? Take advantage of that now, while we're here.  Q.  When you heard [plaintiff] say … 'aprovecha', or take advantage,

Second, Mr. Frese found the fact that the Michelin tires had been installed in plaintiff's personal BMW on January 2, 2016 to be fatal to plaintiff's allegation, as it belied his initial version to Mr. Morán in that he purchased the tires for his personal BMW on February 24, 2016. It seemed impossible to Mr. Frese that plaintiff could have purchased the tires for his personal vehicle on February 24, 2016, 51 days after the tires had been installed on the BMW. Thus, it seemed clear to Mr. Frese that the February 24, 2016 transaction was plaintiff's attempt to cover up the fact that he had intentionally used the corporate P-Card to buy tires for his personal BMW. See, SUMF (Docket No. 40-2, ¶88, p. 24).[22]

Third, Mr. Frese found it difficult to believe that, even if plaintiff had thought that he had paid for the Michelin tires in December 2015 using his personal credit card, and the transaction had been a mistake, he had not realized or corrected the mistake for over two months. It seemed highly questionable to Mr. Frese that, for over two months, plaintiff had failed to notice that the $1,373.59 charge had not been made to his personal credit card. See, SUMF (Docket No. 40-2, ¶88, p. 24).[23]

---

what did that make you think about his offer? A. Nothing, I told him I didn't need anything." See, Mr. Haddock's Deposition (Docket No. 40-12), p. 13.

[22] Plaintiff denies having told Mr. Morán that he purchased the tires in February 2016, rather than that he installed the tires on that date (Docket No. 47, pp. 43, 46). Mr. Morán's report indicates that plaintiff "failed to voluntarily share the fact that he purchased tires for this personal vehicle (BMW X5, this surfaced during a call [Mr. Morán] initiated to Costco Tire center in [plaintiff's] presence" (Docket No. 40-20, p. 1). In addition, the report states that "[Mr. Morán] called Costco Tire center with [plaintiff] present, to ask about this transaction. The attendant, when provided [plaintiff's] Costco membership # 111832596002, which was used for the purchase, informed that under that membership number, tires had been installed on the Ford Pick-up Truck in December, and to a BMW Sport vehicle on January 2, 2016. [Plaintiff] argued that had occurred in February, and paid with his personal credit card. The attendant recognized there was a transaction for tires (Costco part # 1020363) under that membership # for the amount of $1,373.59 (exactly the same amount as the December Baxter card purchase of the Michellin tires). [Mr. Morán] asked [plaintiff] why he hadn't voluntarily offered the information during our previous discussion, that he had personally purchased tires for his BMW on or around the dates in question. He replied that he should have done it but failed to do so." Id. at p. 2. From the text as a whole, it was not unreasonable for Mr. Frese to have perceived that plaintiff told Mr. Morán he purchased the tires in February 2016. But even if it were assumed that Mr. Frese misunderstood plaintiff's words to Mr. Morán, there is no dispute that this is what Mr. Frese informed Ms. Centeno and Ms. Bayrón. Further, it would not undercut Mr. Frese's conclusion that plaintiff intentionally used the corporate P-Card to buy tires for his personal BMW and attempted to cover it up, as plaintiff's having said that he "purchased" the tires in February is but one of the grounds upon which Mr. Frese's determination on this subject is based. Not only that, to say that the tires were installed in February is contrary to the information respecting the tire installation date that Mr. Morán provided to Ms. Centeno, based on what the Costco attendant told Mr. Morán on March 11, 2016. Mr. Frese was aware of this information, for it was in Mr. Moráns report, which he reviewed. Furthermore, the Costco receipt, which Mr. Frese obtained, links plaintiff, his car, and the tires purchased in December 2015 to the Costco Tire Center on January 2, 2016.

[23] Plaintiff asserts that he had not reversed the purchase because he was providing services to the Baxter plant in Jayuya at the time the card statements were coming in instead of at the Aibonito plant, and thus, had not reviewed the statements in question (Docket No. 47, p. 46). At the same time, he testified that he rarely reviews the personal account statements; and that he brings up the site, and pays (Docket No. 44-4, p. 7). Similarly, he stated that he was

Fourth, given that plaintiff had to review and sign the P-Card account statement for the December 2015 billing cycle prior to submitting it to the Finance Department, Mr. Frese found it hard to believe that plaintiff had not noticed that there was a charge of $1,373.59 in the P-Card statement for December 2015 that should not be there.  See, SUMF (Docket No. 40-2, ¶88, p. 25).[24]

Fifth, Mr. Frese believed that plaintiff did not have the intention of correcting his mistake until after he realized that Baxter was investigating the tire purchases on the same day plaintiff had been told that Mr. Morán had been seen in the parking inspecting the tires of the fleet.  Based on his experience, having conducted approximately 100 investigations regarding misuse of the corporate credit cards, Mr. Frese knows that people who make honest mistakes using their P-Cards typically realize and correct their mistakes within 24-48 hours, and immediately notify the company as to their mistake.  In this situation, however, plaintiff had waited over two months, did not volunteer the information to the company and, coincidentally, sought the credit to the P-Card on the same day in which Baxter received the tip from Haddock and began its investigation.  See, SUMF (Docket No. 40-2, ¶88, p. 25).[25]

Sixth, plaintiff shifted explanations as to the tire purchases between his meeting with Mr. Morán and his meeting with Mr. Frese, which led Frese to believe that plaintiff was being untruthful.  See, SUMF (Docket No. 40-2, ¶88, p. 25).[26]

---

not suspicious when he did not see the $1,373.59 charge in the statement.  Id.  Mr. Frese found this questionable.  In consequence, the objection does not negate Mr. Frese's conclusion.

[24] Plaintiff avers that he had not reversed the purchase because he was providing services to the Baxter plant in Jayuya at the time the card statements were coming in, instead of the Aibonito plant, and thus he had not reviewed the statements at issue (Docket No. 47, p. 47).  The allegation does not negate Mr. Frese's conclusion.

[25] Plaintiff adduces that he had not reversed the purchase before February 24, 2016, because he was providing services to the Baxter plant in Jayuya at the time the card statements were coming in, instead of at the Aibonito plant, and thus had not reviewed the statements in question; by that date, he was not aware that the $1,373.59 transaction was being audited, investigated or had caught Baxter's attention; and that he reversed the transaction as soon as he noticed that the purchase was not on his personal card (Docket No. 47, p. 47).  The allegation does not negate Mr. Frese's conclusion, a conclusion that coincides with that of Mr. Morán.  In fact, as part of his analysis, Mr. Morán pointed out that after being informed of Mr. Haddock's allegations, he went to the parking area to check the Company's vehicles' tires, and a short while later, plaintiff showed up in Mr. Morán's office for no particular reason, which made him suspicious that plaintiff had found out that the Company was investigating the tire purchases, as coincidentally, plaintiff had also sought the credit to his P-Card that same evening (Docket No. 40-16, p. 6, ¶ 21).

[26] Plaintiff protests that he did not shift explanations, because he explained to Mr. Morán that "it was a mistake," which is "the same explanation" that he gave Mr. Frese during his interview (Docket No. 47, p. 48).  From the record, plaintiff admitted to Mr. Morán that he should have volunteered that he purchased tires for his BMW on or around the dates in question (Docket No. 40-20, p. 2).  Not doing something that should have been done may be considered a

Seventh, as stated in Mr. Morán's report, Morán identified several inconsistencies and irregularities between the documents relating to the tire transaction and plaintiff's explanation regarding the tire purchases, and plaintiff was never able to provide an adequate explanation for the discrepancies. See, SUMF (Docket No. 40-2, ¶88, p. 25).[27]

Eighth, Mr. Frese found Mr. Haddock's demeanor to be a lot more credible than plaintiff's demeanor. Mr. Haddock seemed calm and collected, whereas plaintiff seemed nervous and could not provide any coherent explanations for the timeline of the purchases and the refund. See, SUMF (Docket No. 40-2, ¶88, p. 26).

After Mr. Frese conducted his interviews, he informed Ms. Bayón and Ms. Centeno that

based on the information he gathered during the investigation, he believed that plaintiff

---

mistake. But what he told Mr. Frese was that the Costco cashier made a mistake, because according to plaintiff, he gave the cashier two cards and the cashier charged both sets of tires to the same card (Docket No. 47-1, p. 193). So, even though the subject of the assertion was "mistake," the content of the representation was different. And by the time plaintiff met with Mr. Frese, he was no longer relying on the initial explanation that he gave to Mr. Morán about "less than four tires been available to install on the Ford Pick-up Truck." See, Mr. Morán's Report (Docket No. 40-20), pp. 1-2. Considering all of these versions coming from the same source- plaintiff -it was not unreasonable for Mr. Frese to believe that plaintiff was being untruthful.

[27] Plaintiff observes that Mr. Morán's "notes" do not mention "inconsistencies" or "irregularities" (Docket No. 47, p. 48), and contends that because Mr. Frese does not possess first-hand knowledge of Mr. Morán's state of mind, it is inadmissible hearsay. Id. The points are undeveloped. Nonetheless, three observations are in order. First, although Mr. Morán's "notes" do not use the term "inconsistencies" or "irregularities," they refer to "discrepancies." See, Morán Report (Docket No. 40-20, p. 3). Further, they mention what may fairly be described as incongruities between, (i) plaintiff's initial explanation about "less than four tires" having been available for the Company's Ford Pick-up truck, which according to plaintiff led him to cancel the transaction, and (ii) the time and sequence of the transactions identified in the sales audit transaction detail reports that plaintiff provided to Ms. Muñoz, and which Mr. Morán examined. Id. at pp. 1, 2, 3 (raising issue and plaintiff's lack of explanation for the asserted contradiction). Second, Mr. Morán's impressions are included in the report that he wrote, which Mr. Frese reviewed. He has first-hand knowledge of what he read. Third, as will be discussed below, the decisionmakers relied on Mr. Morán's and Mr. Frese's conclusions, findings and opinions, which places these materials beyond the scope of the hearsay exclusion rule, as they are admissible to demonstrate the decisionmakers' state of mind. See, Vázquez-Valentín v. Santiago-Díaz, 459 F.3d 144, 150-151 (1st Cir. 2006)(evidence of comptroller's audit and of ensuing communications between municipal administration and commonwealth officials not hearsay, as they were used to explain the decisionmakers' decision to demote plaintiff); Ramírez Rodríguez v. Boehringer Ingelheim Pharmaceuticals, Inc., 425 F.3d 67, 76-77 (1st Cir. 2005)(admitting report and physician statements against hearsay challenge, to show that based on an investigation, decisionmaker had reason to believe that plaintiff had engaged in misconduct, and that this was the information defendant had before it and considered when it made the decision to terminate plaintiff's employment); Bush v. Dictaphone Corp., 161 F.3d 363, 366-367 (6th Cir. 1998)(statements to decisionmakers that plaintiff was abusive or unstable admitted over hearsay objection to legitimately show the grounds upon which the decisionmakers based their decision to terminate plaintiff's employment).

González-Santiago v. Baxter Healthcare S.A., et al.
Civil No. 16-2929 (PAD)
Opinion and Order
Page 23

intentionally used his P-Card to purchase tires for his personal vehicle and lied during the investigation in an attempt to cover up his misconduct.  See, SUMF (Docket No. 40-2, ¶¶ 89, 90).  Mr. Frese is a U.S. Army veteran, left service with the rank of Captain, and has a daughter on active duty with the U.S. Navy.  Id. at ¶ 91.  His father and three uncles served in the U.S. military.  Id.

## I.  Decision

Ms. Bayrón and Ms. Centeno reviewed the information, documents and evidence gathered during the investigation, finding Mr. Morán's and Mr. Frese's conclusion that plaintiff intentionally used the P-Card for a personal purchase and lied during the investigation entirely credible.  See, SUMF (Docket No. 40-2, ¶ 93).[28]  Relying on this information, they determined that plaintiff incurred in three (3) "major offenses" to the Employee Manual, that is, offenses defined as "those that adversely affect the appropriateness of a person as an employee of our company, and therefore, may result in termination of employment on the first occasion," including: (i) major offense 2 "falsification and alteration of files and documents;" (ii) major offense 6 "rob, steal or unduly appropriate the property of other employees, vendors or of the company;" and (iii) major offense 25 "refuse to fully cooperate in any investigation carried out by the Company.  These

---

[28] Plaintiff denies SUMF (Docket No. 40-2 ¶ 93), charging that Mr. Frese made "some findings," not conclusions, and Mr. Morán's "notes" do not contain conclusions (Docket No. 47, p. 51).  For one thing, describing the result of Mr. Frese's assessment as "findings" rather than "conclusions" is not important.  Both terms convey Mr. Frese's reading of the issue and of the circumstances that he investigated, and his opinion about what transpired.  For another thing, while Mr. Morán's "notes" do not contain a section titled "conclusions," they include a description of his thought process, and of the factual elements that informed it.  More important, Mr. Morán reached conclusions that he shared with Ms. Centeno, which much like Mr. Frese's findings, the decisionmakers relied on as part of the evaluation process leading to plaintiff's termination.

González-Santiago v. Baxter Healthcare S.A., *et al.*
Civil No. 16-2929 (PAD)
Opinion and Order
Page 24

include providing false, incorrect or incomplete information or omitting information regarding the investigative process." Id. at ¶¶ 94-95.[29]

Mindful of this information, Ms. Bayrón and Ms. Centeno determined that plaintiff: (1) falsified or altered documents by submitting partial copies of the Costco receipts, intentionally omitting the transaction details; (2) stole money from Baxter by using the P-Card to purchase tires for personal use; and (3) provided false information, or omitted information, during the course of the investigation when he lied about the tire purchases or otherwise failed to disclose them. See, SUMF (Docket No. 40-2), ¶ 96.[30] They believed plaintiff's conduct was unacceptable given that he was an EHS Manager charged with administering safety and security at the plant, and in his position had obtained sensitive and confidential company information. Id. at ¶¶ 97-98. They decided that he could not be trusted, and his continued employment was untenable and should be terminated. Id. at ¶¶ 99-100.

---

[29] Plaintiff denies in part SUMF (Docket No. 40-2 ¶ 94 and ¶ 95), expressing that Ms. Centeno admitted plaintiff had no knowledge that he was under investigation when he allegedly provided false information (Docket No. 47, pp. 52-53); Ms. Centeno's notes from the telephone call she and Ms. Bayrón had with Elizabeth Bronnenberg (Vice President of Human Resources) do not make reference to employee manual offenses identified in the text (id., p. 52); and Mr. Morán's notes do not refer to them either. Id. at p. 53. First, the fact a person does not know he is being investigated does not controvert the fact that he has lied during the course of that investigation. In this setting, lying does not depend on having knowledge that an investigation is ongoing, if in fact it is being conducted, as undoubtedly was the case here. Second, that Ms. Centeno's notes from the telephone conversation do not refer to particular provisions of the Employee Manual does not controvert the fact that she and Ms. Bayrón determined that, based on the result of the investigation that Mr. Morán and Mr. Frese carried through, plaintiff's conduct violated the Employee Manual. There is nothing unusual with conduct initially detected during an investigation to in turn be assessed, and as a result, be identified as falling within the scope of prohibitions set in a Code of Conduct. See, Doe, 903 F.3d at 1227-1228 (defendant investigated complaint, concluding that plaintiff engaged in complained of conduct, and that in turn, such conduct violated the organization's Code of Conduct). Third, Mr. Morán's role- as that of Mr. Frese -was to investigate the facts, not the consequences. He did so, informing Ms. Centeno of his findings, observations, and conclusion. Based on this information- and the one Mr. Frese provided –Ms. Centeno and Ms. Bayrón determined that plaintiff's conduct violated the Manual. The objection does not create a genuine issue of material fact.

[30] Plaintiff received copy of the Employee Manual. See, SUMF (Docket No. 40-2, ¶ 95); Plaintiff's Deposition (Docket No. 40-4, pp. 53-54).

On April 14, 2016, Ms. Bayrón and Ms. Centeno called Elizabeth Bronnenberg, Vice President of Human Resources, and spoke with her about the outcome of the investigation and their determination that plaintiff's employment should be terminated, a decision which Ms. Bronnenberg ratified.  See, SUMF (Docket No. 40-2, ¶¶ 92, 100).[31]  Neither José Rodríguez – plaintiff's direct supervisor at that time – nor Mr. Morán or Mr. Frese participated in the decision to terminate plaintiff's employment.  Id. at ¶¶ 101-102.  They were not the decisionmakers.  Baxter has terminated every employee who has been shown to have intentionally used the corporate credit card for personal gain.  Id. at ¶ 121.[32]

## J.   Weekend Drill

Plaintiff claims to have attended a military drill on Saturday, April 9, 2016 and Sunday, April 10, 2016, albeit Baxter does not have evidence that plaintiff formally notified the Human Resources Department that he would be attending a military drill on those dates.  See, SUMF (Docket No. 40-2), ¶¶ 116-120.  Plaintiff stated during his deposition that he did so inform his then direct supervisor, José Rodríguez, and his work group of the drill (Docket No. 47, p. 66).  Mr. Rodríguez has denied plaintiff's assertion, pointing out that he was not aware that plaintiff "allegedly attended a military drill on April 9-10, 2016" (Docket No. 40-29, ¶ 6), and there is no

---

[31] Plaintiff only qualifiedly admits SUMF (Docket No. 40-2), ¶ 100, because Ms. Centeno's notes regarding her conversation with Ms. Bronnenberg do not make reference to the terms "dishonesty," "fraud," or "trustworthiness" (Docket No. 47, p. 57).  First, the investigators concluded that plaintiff intentionally used the P-Card to purchase tires for his personal car and lied during the ensuing investigation to cover up the misconduct.  That is what the investigation turned out, its outcome, and as stated in the text, that outcome was brought to Ms. Bronnenberg's attention during the telephone conversation she had with Ms. Centeno and Ms. Bayrón.  Second, that Mr. Morán's notes do not use the words "dishonesty," "fraud," or "trustworthiness" does not contradict the outcome of the investigation, or that it was disclosed to Ms. Bronnenberg during the telephone conversation.  Those notes refer, among other things, to unexplained discrepancies between information included in the sales audit transaction reports that plaintiff passed on to Baxter as support for the credit card charges, and the version of the events that he initially gave to Mr. Morán.  Notes are not transcripts, nobody has described them as such, and their content is not contrary to the SUMF.

[32] See also, Mr. Frese's "Unsworn Declaration under Penalty of Perjury" (Docket No. 40-23, p. 6, ¶ 25).

González-Santiago v. Baxter Healthcare S.A., *et al.*
Civil No. 16-2929 (PAD)
Opinion and Order
Page 26

information in the record of who was in plaintiff's work group and received notice that he would

attend a drill on those dates.  In any event, for summary judgment purposes the court assumes that

plaintiff attended a drill on those dates.  But it is uncontroverted that Mr. Rodríguez did not inform

Ms. Centeno, Ms. Bayrón or Ms. Bronnenberg that plaintiff had attended a military drill on April

9-10, 2016 (id., ¶ 7 ), and that Ms. Centeno, Ms. Bayrón and Ms. Bronnenberg were unaware of

the drill when they decided to terminate plaintiff's employment.  See, SUMF (Docket No. 40-2,

¶¶ 119-120).[33]

### K. **Notification**

On April 15, 2016, Ms. Centeno and Mr. Rodríguez met with plaintiff and notified him

that he was being let go.  See, SUMF (Docket No. 40-2, ¶ 103).  Ms. Centeno offered him the

opportunity to resign so that his career (civil and military) would not be affected, but he refused.

See, SUMF (Docket No. 40-2, ¶¶ 104-105); Plaintiff's Deposition (Docket No. 40-4, p. 58).[34]  The

termination was effective on April 14, 2016.  See, "[Plaintiff's] Statement of Uncontested Material

Facts in Support of Motion for Partial Summary Judgment" (Docket No. 42-1, ¶ 46).

---

[33] Plaintiff denies SUMF (Docket No. 40-2 ¶¶ 119-120), declaring that he notified the military drill to his "work group," and to Mr. Rodríguez, "who participated in the termination meeting and communicated the termination to [p]laintiff;" and that Ms. Centeno "brought up [p]laintiff's military status during the termination meeting and during Frese's interview" (Docket No. 47, ¶¶ 119-120).  First, even assuming plaintiff notified Mr. Rodríguez of the drill, Rodríguez testified without contradiction that he did not participate in the investigation regarding plaintiff's misconduct or in the decision to terminate plaintiff's employment.  See, Mr. Rodríguez' Deposition (Docket No. 40-28, p. 2).  Second, plaintiff has not come up with affirmative evidence that anybody notified Ms. Centeno, Ms. Bayrón or Ms. Bronnenberg of the drill, and to genuinely dispute that they were unaware of that drill when they decided to terminate plaintiff's employment.  Third, that Ms. Centeno may have mentioned plaintiff's military status during the termination meeting- a topic addressed below -does not prove that Ms. Centeno was aware of the drill when she, Ms. Bayrón, and Ms. Bronnenberg spoke about plaintiff's dismissal.

[34] Ms. Centeno testified that she wanted to help plaintiff in the transition phase after exiting the Company.  See, Ms. Centeno's Deposition (Docket No. 40-11), p. 34.

González-Santiago v. Baxter Healthcare S.A., *et al.*
Civil No. 16-2929 (PAD)
Opinion and Order
Page 27

## III.   DISCUSSION

### A.  USERRA

#### a.  Discrimination

Plaintiff alleges that Baxter discriminated against him in violation of USERRA (Docket No. 23, ¶ 44; Docket No. 46, p. 6).  USERRA prohibits employers from discriminating "against persons because of their service in the uniformed services."  38 U.S.C. § 4301 (a)(3).  To this end, it provides that a member of a uniformed service "shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that [service]."  Id. § 4311(a).  The employer violates this provision "if the person's membership … in the uniformed services is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership …. "  Id. § 4311(c)(1).

In this light, USERRA discrimination claims call for a "two-pronged burden-shifting analysis."  Velázquez-García v. Horizon Lines of Puerto Rico, Inc., 473 F.3d 11, 17 (1st Cir. 2007).  Under this standard, the plaintiff "bears the initial burden of showing, by a preponderance of the evidence, that his military status 'was at least a motivating or substantial factor' in the adverse employment action."  Angiuoni v. Town of Billerica, 838 F.3d 34, 39 (1st Cir. 2016).  Plaintiff need only show that his military service "was one of the factors that a truthful employer would list if asked for the reasons for its decision."  Kane v. Town of Sandwich, 123 F.Supp.3d 147, 154 (D. Mass. 2015).  In other words, if the employer were asked at the moment the adverse employment decision was made, "what the reasons for that decision were and was forced to answer candidly, one of those reasons would be the employee's military obligations."  Hogan v. United Parcel Service, 648 F.Supp.2d 1128, 1138 (W.D.Mo. 2009).

Should the plaintiff meet the initial burden, the burden shifts to the employer to prove "that the action would have been taken despite the protected status." Hogan, 648 F.Supp.2d at 1138.  In that event, the employer must show that the reason it has asserted, standing alone, "would have induced it to make the same decision."  Robinson v. Morris Moore Chevrolet-Buick, Inc., 974 F.Supp. 571, 576 (E. D. Tex. 1997).  Contrary to the situation under the framework premised on McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), in the context of USERRA the employer must demonstrate that the reason stated for the adverse action was not a pretext for discrimination. See, Velázquez-García, 473 F.3d at 17 (pointing out differences between the Mc Donnell Douglas and USERRA frameworks).  As such, the test requires "more than articulation of a legitimate nondiscriminatory reason for the decision."  Daggett v. Chicago Transit Authority, 1998 WL 831848, * 10 (N.D. Ill. Nov. 25, 1998).  Thus, once the plaintiff meets his initial burden, USERRA shifts both the burden of production and persuasion to the employer.  See, Sheehan v. Department of Navy, 240 F.3d 1009, 1014-1015 (Fed. Cir. 2001)(discussing topic).[35]

Military status is recognized as a motivating factor "if the employer relied on, took into account, or conditioned its decision on the employee's military-related absence or obligation." Kane, 123 F.Supp.3d at 154.  Discriminatory motivation because of military status "may be proven by direct or circumstantial evidence." Angiuoni, 838 F.3d at 39.  Circumstantial evidence includes proximity in time between the employee's military activity and the adverse employment action, expressed hostility towards members protected by statute together with knowledge of the employer's military activity, inconsistencies between the proffered reason and other actions of the

---

[35] See also, Walker v. Mortham, 158 F.3d 1177, 1184-1185 n. 10 (11th Cir. 1998), *cert. denied* 528 U.S. 809 (1999)(distinguishing the employer's  burden to prove affirmative defense under the National Labor Relations Act, which served as model for USERRA's evidentiary framework, from the McDonnell Douglas *prima facie* case model, which shifts to the employer the burden of production but not the risk of nonpersuasion).

employer, and disparate treatment of certain employees compared to other employees with similar work records or offenses.  See, Rivera-Cartagena v. Wal-Mart Puerto Rico, Inc., 802 F.Supp.2d 324, 342 (D.P.R. 2011)(listing factors).

### 1.  **First Prong: *Prima Facie* Case**

There is no direct evidence of discrimination.  As for circumstantial evidence, defendants contend it is lacking, arguing that plaintiff failed to make an initial showing that his military status was a motivating factor in the termination, and in any event, plaintiff would have been terminated notwithstanding his protected status (Docket No. 40-1, p. 2).  They point out that plaintiff was discovered to have purchased a set of tires for his personal vehicle using the corporate credit card, and after a co-worker voluntarily tipped-off Baxter of the transaction, the Company conducted an internal investigation, concluding that plaintiff made the purchase intentionally and then attempted to cover up his act, lying and omitting critical information during the course of investigation.  Id. at pp. 2, 14-16.

It is apparent that these are legitimate grounds for dismissal.  See, Vega-Ruiz v. Wal-Mart Puerto Rico, Inc., 2010 WL 5376124, *4-*5 (D.P.R. Dec. 27, 2010)(dismissing complaint brought by employee terminated for misuse of corporate credit card); Bailey v. Ford Motor Co., 2006 WL 2620279, *2, *5 (E.D. Mich. Sept. 13, 2006)(sustaining termination based on employee's use of corporate credit card for unauthorized purchases that were most likely for personal use); Parker v. Georgia-Pacific Corp., 247 Fed.Appx. 507, 509 (5th Cir. 2007)(dishonesty valid reason for termination); Amezquita v. Beneficial Texas, Inc., 264 Fed.Appx. 379, 386 (5th Cir. 2008)(termination legitimately based on management's belief that plaintiff lied during investigation); Total System Services, Inc., 221 F.3d at 1173, 1176 (lying during investigation legitimate reason for discharge); McDuffie-Smithson v. University of South Carolina School of

Medicine, 2012 WL 3637736, *1, *3 (D.S.C Jul. 19, 2012)(rejecting claim of employee terminated for charging personal items to employer's credit card and altering receipts to hide the unauthorized purchases).[36]   And they are not related to military service.   See, Hance v. BNSF Ry. Co., 645 Fed.Appx. 356, 365-366 (6th Cir. 2016)(dismissing USERRA failure to hire claim because decisionmaker believed plaintiff was dishonest and untrustworthy in light of misrepresentations that he had previously made); Padilla-Ruiz v. Communication Technologies, Inc., 355 F.Supp.3d 441, 445-446 (E.D. Va. 2019)(dismissing USERRA claim of plaintiff terminated for lying to coworker in an attempt to switch work schedule by stating that unless he switched the schedule he could not complete an army reserve training- a training that had not even been scheduled -when what it conflicted with was plaintiff's daughter's birthday; and reporting in timecard that he had worked eight hours on a day that he had been absent from work); Dean v. Eli Lilly and Company, 2019 WL 3818774 (S.D.Ind. Aug. 14, 2019)(dismissing USERRA claim of plaintiff terminated for falsification of records and dishonesty during investigation).   The protection of a service member's employment "may be conditioned on compliance with reasonable and ordinarily accepted standards of conduct and performance."   Figueroa Reyes v. Hospital San Pablo del Este, 389 F.Supp.2d 205, 212 (D.P.R. 2005).

Plaintiff counters that he has made a *prima facie* showing because: (1) of the proximity between the April 2016 military drill and the termination; (2) termination is the result of a "pattern" of hostility that started in 2007 when plaintiff was accused of stealing money from the Company upon returning from a military leave in Mississippi, which forced him to procure the assistance

---

[36] See also, Dickerson v. Walgreen Co., 345 Fed.Appx. 178, 179-180 (7th Cir. 2009)(dismissing discrimination claim of store manager terminated for violating company policy by authorizing the use of money that customer found, to cover shortage of money in cash drawer).

and intervention of the Judge Advocate General; (3) coworkers made disrespectful and humiliating comments regarding his military activities; (4) he had to work and take work-related calls during his military leaves (5)  Mr. Rodríguez questioned his absence from work; (5) plaintiff's military status was brought up during the termination meeting; (6) Baxter did not comply with its own termination procedures; and (7) no company money or property were ultimately lost as a result of the P-Card incident, which was a simple mistake (Docket No. 46, pp. 8-11).   None of these elements is sufficient, individually or collectively, to establish a *prima facie* case of discrimination in this case.

### i. <u>Proximity</u>

The April 9th and 10th drill was followed by termination on April 15th.  But proximity in time "is not an exclusive test limiting the court to look only at the proximity of an adverse employment action to military activity."  <u>Rivera-Cartagena</u>, 802 F.Supp.2d at 342-343 (<u>citing</u> <u>Velázquez</u>, 473 F.3d at 19).[37]   The record must show a cognizable nexus between the military activity and the adverse action.  At a minimum, that nexus requires knowledge.  Strictly speaking, the decisionmaker must be aware of the protected activity that he is believed to be reacting to.  <u>See</u>, <u>Pomales</u> v. <u>Celulares Telefónica, Inc.</u>, 447 F.3d 79, 85 (1st Cir. 2006)("Temporal proximity can create an inference of causation in the proper case.  But to draw such an inference, there must be proof that the decisionmaker knew of the plaintiff's protected conduct when he or she decided to take the adverse employment action")(internal citation omitted).   However, no such nexus is

---

[37] <u>See also</u>, <u>Chacon</u> v. <u>Brigham and Women's Hosp.</u>, 99 F.Supp.3d 207, 215 (D. Mass. 2015)(noting in context of FMLA, that temporal proximity is not enough to infer an employer's bad motive in absence of facts directly connecting leave status to termination, such as negative comments, expressions of reluctance by superiors, and discussion of leave status in performance reviews).

present here.  Simply put, the evidence does not show that the persons who made the decision to terminate plaintiff's employment were aware that he had been on a drill on April 9 and 10, 2016. See, Escher v. BWXT Y-12, LLC, 627 F.3d 1020, 1026-1027 (6th Cir. 2010)(considering that decisionmaker had no knowledge of plaintiff's military-leave complaints, the temporal proximity between the investigation of plaintiff's use of email and his complaints about military leave did not show discriminatory motivation); Vaughn v. Titan Intern. Inc., 72 F.Supp.3d 809, 817-818 (N.D. Ohio 2014)(dismissing USERRA claim in absence of evidence that decisionmakers were aware of plaintiff's advocacy in favor of another employee's rights under USERRA).[38]

As well, the investigation that led to plaintiff's termination began before his protected activity, belying the conclusion that a reasonable factfinder might find that the employer's decision was motivated by that activity.  See, Francis v. Booz, Allen & Hamilton, Inc., 452 F.3d 299, 309 (4th Cir. 2006)(applying formulation to dismiss USERRA claim).   And the remark that Ms. Centeno made during the termination meeting –along the line that plaintiff could resign in order not to affect his civil and military career– does not manifest a colorable link between plaintiff's military status or activities and the decision to terminate his employment.

First, Ms. Centeno made the remark in the process of informing plaintiff of the decision that he had to leave Baxter employment.  The decision had already been made.  The remaining question was whether plaintiff preferred to resign or be dismissed.  That the choice was passed on to plaintiff is unremarkable.  See, Bailey v. Oakwood Healthcare, Inc., 2017 WL 3616478, *6 (E. D. Mich. Aug. 23, 2017)(plaintiff given the opportunity to resign in lieu of being terminated in

---

[38] See also, Caines v. City of New York, 649 Fed.Appx. 74, 76 (2nd Cir. 2016)(noting lack of evidence that decisionmaker was aware plaintiff had planned to take military leave when he prepared the "command discipline" in question that plaintiff received after returning from leave).

part because this would look better on future job applications); Williams v. Philadelphia Housing Authority, 834 F.Supp. 794, 799 (E.D. Pa. 1993)(plaintiff offered opportunity to resign in order to preserve his employment record and reputation); Brozovich v. Dugo, 651 A.2d 641, 644 (Pa. 1994)(plaintiff provided with opportunity to resign to prevent harm to his reputation).[39]

Second, alongside stands Ms. Centeno's reference to plaintiff's civil or military career and why he should resign to protect them. A manager's knowledge of an employee's military status does not make the employer automatically liable under USERRA. See, Rivera-Cartagena, 802 F.Supp.2d at 343 (even though employer knew that plaintiff was in the National Guard, plaintiff did not set forth facts that could lead the court to conclude that employer's decision regarding termination was taken because of plaintiff's military status rather than because of plaintiff's violation of the employer's strict alcohol and drug abuse policy); Stadtmiller v. UPMC Health Plan, Inc., 799 F.Supp.2d 492, 516-517 (W.D. Pa. 2011)(dismissing USERRA claim despite supervisor's awareness of plaintiff's National Guard status and continuing service obligations, as there was no evidence that military status played any role, much less that it was a motivating factor, in the employer's determination to terminate plaintiff). And neither does a manager's bare reference to the military. See, McConnell v. Anixter, Inc., 944 F.3d 985, 989 (8th Cir. 2019)(dismissing USERRA in spite of the fact that human resource official told plaintiff that the company was not a military operation, and that plaintiff was not in the military anymore); Figueroa

---

[39] See also, Gorham v. Town of Trumbull Board of Education, 7 F.Supp.3d 218, 235 (D. Conn. 2014)("Based on [the] investigation, the [Board of Education] concluded that [plaintiff] committed theft and was dishonest. That conclusion led the [Board] to offer [plaintiff] resignation in lieu of termination"); Nance v. Health Care Authority of City of Huntsville, 2020 WL 2840092, *11 (N.D. Ala. June 1, 2020)(offering plaintiff opportunity to resign in lieu of termination to make it easier for her to find another position); Phanthalasy v. Hawaiian Agents, Inc., 2019 WL 2305133, *1 (D. Haw. May 30, 2019)( offering plaintiff opportunity to resign in lieu of termination due to concerns about his future employability); Zellner v. Herrick, 2010 WL 2605385, *16 (E.D. Wis. June 25, 2010)(plaintiff given the opportunity to resign to minimize impact of his behavior on his family and personal reputation).

González-Santiago v. Baxter Healthcare S.A., et al.
Civil No. 16-2929 (PAD)
Opinion and Order
Page 34

Reyes, 389 F.2d at 209-210 (letter from supervisor expressing that plaintiff needed to be more consistent in giving advance notice of military leave found insufficient with other evidence to raise *prima facie* case for any claim under USERRA).  In the same fashion, Ms. Centeno's remark does not carry any anti-military sentiment that would cast a shadow over the legality of the decision to terminate plaintiff's employment.[40]

### ii.  **Hostility**

There is no evidence of expressed hostility toward service members or military activities, or attestation or documentation that Baxter has subjected servicemembers to adverse employment actions as a result of their membership in or participation in the military.[41]  Likewise, plaintiff

---

[40] Plaintiff alleges that Mr. Frese told him during the interview that the situation could affect his military career (Docket No. 40-4, p. 55; Docket No. 47-1, pp. 36, 39).  If made, the comment does not reflect an anti-military sentiment or divest Mr. Frese's findings of foundation, especially given that Mr. Frese is a former service member.  To illustrate the point, in addition to the cases cited in the text, see, Vega-Colón v. Wyeth Pharmaceuticals, 625 F.3d 22, 27-28, 31-32 (1st Cir. 2010)(dismissing USERRA action based on failure to hire plaintiff for another position within the company even though one of his supervisors- Quiñones -who sat on the selection panel, had once questioned plaintiff about his status with the military; however, both Quiñones and another supervisor expressed that the person selected over plaintiff was the strongest candidate, and plaintiff put forth no evidence to genuinely contradict the employer's reason to select that person for the position); Starr v. Quiktrip Corporation, 655 Fed.Appx. 642, 646 (10th Cir. 2016)(dismissing USERRA discriminatory termination claim even though after plaintiff returned from a tour in Afghanistan, plaintiff's supervisor- a former service member -asked plaintiff whether he had "got all of his killing done," and told him "you ought to just go back into the military since you like it so much"); Bennett v. Dallas Independent School Dist., 936 F.Supp.2d 767, 774-775, 787-788 (N.D. Tex. 2013)(dismissing USERRA action notwithstanding supervisor's reference to plaintiff's military service in Irak and Afghanistan in relation to request that plaintiff submit to psychological fitness for duty examination).  Coincidentally, during his deposition plaintiff was asked, and answered: Q. "That you know, did John Frese have a reason to have anything against you?"  A. "I hardly knew him."  Q. "Therefore, the answer is no?"  A. " No."  Q. "Excuse me?"  A. "No."  (Docket No. 56-1, p. 119, ¶ 112.)  As for awareness of potential effect on military career, see, Fitzpatrick v. United States, 754 F.Supp. 1023, 1036 (D. Del. 1991)(noting, albeit in a case under the Federal Tort Claims Act arising from the negligent operation of a government-leased vehicle, servicemember's awareness of the risk that the incident would have on his military career).

[41] Baxter points out it has five employees in the Aibonito plant to which plaintiff was assigned who serve or have served in the military and none of them has been subject to adverse employment action because of service.  See, SUMF (Docket No. 40-2 ¶¶ 122-123).  Plaintiff denies the assertion as inadmissible hearsay (Docket No. 47, ¶¶ 122-123).  The challenge is undeveloped.  Still, the information comes from Elizabeth Centeno, the custodian of Baxter's personnel and payroll files in the Aibonito plant (Docket No. 40-3, ¶ 4).  See, Nader v. Blair, 549 F.3d 953, 963 (4th Cir. 2008)(overruling objection regarding affidavit from Assistant Director of Human Resources).  At any rate, plaintiff has not affirmatively presented evidence to contradict Baxter's statement or to show that any current or past service member in the organization has been subject to an adverse employment action because of that service.

always returned from military leaves to the same position; on several occasions received promotions after his return; and none of the decisionmakers ever expressed animus toward servicemembers or plaintiff's military activities.[42]  Thus, reasonably viewed, the record does not sustain the inference that Baxter's interaction with servicemembers is or has been hostile.  See, Mace v. Willis, 259 F.Supp.3d 1007, 1021 (D. S. D. 2017)(dismissing USERRA discrimination claim in part because none of plaintiff's supervisors expressed dissatisfaction when plaintiff told them of his military obligations); Mullins v. Goodman Distribution, Inc., 694 F.Supp.2d 782, 791-792 (S. D. Ohio 2010)(dismissing USERRA claim in part because there was no evidence that decisionmaker had expressed any hostility toward employees protected by USERRA); Daggett v. Chicago Transit Authority, 1998 WL 831848, *10 (N.D. Ill. Nov. 25, 1998)(noting that the only thing that would suggest some correlation between plaintiff's military status and his termination was the fact that he was terminated the day before he was to begin his military endeavors, but this totally ignored that on every other occasion, over the span of several years, he was granted the time he sought so he could fulfill his military duties, which negated any suggestion that defendant had an animus towards plaintiff's military status and his obligations relating thereto); Stadtmiller, 799 F.Supp.2d at 516-517 (summary judgment rejecting USERRA claim where plaintiff was never

---

[42] Plaintiff asserts that there were reprimands upon return from military drills (Docket No. 47-1, p. 68, ¶ 121).  The allegation lacks factual content on even basic elements such as who reprimanded him, when, and on account of what, elements necessary to give the assertion any evidentiary weight here.  At page 135 of his deposition, plaintiff said that "when he arrived … they reprimanded [him] for that order in particular" (Docket No. 47-1, p. 4).  Yet it is unclear what he was referring to, the date and context in which whatever happened occurred, the language used, and if that language reflects a degree of objective hostility that ought to be considered in this case or just an honest, reasonable opinion as to an administrative or operational issue.  Employer criticism "is an ordinary and appropriate feature of the workplace."  Reyes-Feliciano v. Marshalls, 159 F.Supp.3d 297, 305 (D.P.R. 2016).  Thus, proof "of more than a plaintiff's subjective belief that he was the target of unlawfulness is required to prove discrimination."  Serrano, 2014 WL 4924434 at *6 (citing Mariani-Colón v. Department of Homeland Security, 511 F.3d 216, 222 (1st Cir. 2007).  Conclusory allegations and empty rhetoric do not create genuine issues of material fact sufficient to defeat summary judgment.  See, Nieves-Romero, 715 F.3d at 378, 380 (articulating and applying proposition).

González-Santiago v. Baxter Healthcare S.A., et al.
Civil No. 16-2929 (PAD)
Opinion and Order
Page 36

denied time off to fulfill military commitments nor told that he was being terminated because he

was a member of the uniformed services).[43]

Plaintiff complains of hostility because in 2007, after returning from a military leave of

absence in Kessler, Mississippi, Angie Lugo, former Human Resources Director at the Aibonito

plant, and Evelyn Valentín from Human Resources, accused him of stealing money- the salary that

Baxter's Payroll Department mistakenly deposited in his account by direct deposit when he was

also being paid by the Military – such that for a time, he essentially received double compensation

by collecting from both Baxter and the Military, receiving more money than he should have. See,

SUMF ¶ 133; OSUMF ¶ 133; Docket No. 47-1, p. 44.[44] He states that Ms. Lugo created an "undue

---

[43] Compare with, Velázquez-García, 473 F.3d at 18 (plaintiff's superiors complained about difficulty of adjusting plaintiff's work schedule because of military leaves of absence); Simmons v. Herblife Intern. of America, Inc., 137 Fed.Appx. 939, 940 (9th Cir. 2005)(plaintiff's immediate supervisor made derogatory statements regarding plaintiff's taking time off work to participate in the Reserves, and that plaintiff was skating on thin ice with management because of taking military duty to play soldier); Vega Colón v. Colomer & Suárez San Juan, Inc., 2020 WL 4548120, *7 (D.P.R. Aug. 6, 2020)(denying summary judgment on discriminatory termination clam in part because plaintiff's supervisor frequently commented that plaintiff's military service and multiple leaves to attend military drills and exercises were problematic; complained about the difficulty of adjusting plaintiff's work schedule as a result of his military leaves every time plaintiff requested military leave; supervisor would always complain about participation in military drills; and on the date of dismissal, an upper-level employee told plaintiff that he was being dismissed because the supervisor could no longer tolerate his military-related absences); Shelton v. Fiskar Brands, Inc., d/b/a Gerber Legendary Blades, 2015 WL 1299241, *4 (D.Or. Mar. 23, 2015)(after learning that plaintiff had an upcoming two-week military duty, supervisor told him "We are too busy this time of year. I don't want you to go on it;" when notified some months later of another military leave, supervisor asked plaintiff for contact information for plaintiff's unit and chain of command, explaining "Certainly, [your chain of command] understands that this a burden to both you and to Gerber as your employer …. Maybe I can help your cause by helping them understand the burden on Gerber;" later, the supervisor called the Command Sergeant Major to inquire about plaintiff's order, and according to the Command Sergeant Major the supervisor was very agitated over plaintiff's having orders for that period and tried to get him out of the orders); Croft v. Village of Newark, 35 F.Supp.3d 359, 368 (W.D. N.Y. 2014)(comments by a chief that the plaintiff was not promoted because he "wasn't around enough," and that "the only place [the plaintiff] had been was military duty," considered as evidence that the defendant was resistant to promoting the plaintiff at least in part because of the plaintiff's military obligations); Robinson, 974 F.Supp. at 574 (plaintiff's supervisor became angry when plaintiff notified him that he had to attend a mandatory physical examination for the army reserve and would therefore miss work at the dealership that day, supervisor called a sergeant at plaintiff's army reserve unit inquiring as to whether plaintiff's physical was mandatory, and when the sergeant informed him that it was, the supervisor became upset and demonstrated hostility toward the idea of plaintiff leaving work to attend the physical).

[44] Pursuant to the Employee Manual, when an employee goes on military leave as a member of the Reserves or National Guard, Baxter pays the difference between the employee's salary and the salary received from the Armed Forces during the first ten days of the leave. See, SUMF (Docket No. 40-2, ¶ 134 n. 8). When an employee is involuntarily called into active duty, Baxter pays for the employee's full salary during the first two weeks of

burden" on him by requiring that he refund the overpayment to Baxter in a lump sum.  Id. at ¶ 134.

The argument is not persuasive.

Bureaucracies make mistakes.  See, Román v. Potter, 604 F.3d 34, 39 (1st Cir. 2010)(plaintiff not paid during leave of absence due to bureaucratic confusion, not out of retaliation).[45]  Like this, that a bureaucratic mistake results in recoupment due to an overpayment, is not inherently discriminatory.  See, Straughn, v. Delta Air Lines, Inc., 250 F.3d 23, 46 (1st Cir. 2001)(dismissing plaintiff's discrimination claim in addition to granting summary judgment to employer on action to recover $11,608.86 in worker's compensation benefits that it had mistakenly disbursed to plaintiff while she remained on full salary during leave of absence); Saunders v. Stone, 758 F.Supp. 1143, 1147 (E.D.Va. 1991)(pay recoupment resulting from mistaken overpayment does not raise an inference of discrimination).

What is more, there is no evidence that despite plaintiff's long years in the military, there was a similar mistaken overpayment problem, before 2007 or thereafter; plaintiff did not attribute the mistake to prohibited animus; and further, admitted that Mr. José Sadurni, then Plant Manager, became involved and established a payment plan, the plan was an acceptable outcome for plaintiff, and the issue was appropriately resolved in 2007.  See, Rivera-García v. Sistema Universitario Ana G. Méndez, 442 F.3d 3, 7 (1st Cir. 2006)(affirming summary judgment against an employment discrimination claim noting that even if there had been mistakes in employer's

---

deployment as well as the difference between the employee's salary and the salary received from the Armed Forces after the third week of activation and up to 52 weeks.  Id.  Those days are not discounted from an employee's vacation days, unless so requested.  Id.

[45] See also, Carmona-Rivera v. Puerto Rico, 464 F.3d 14, 20 (1st Cir. 2006)(no evidence that delay in implementing plaintiff's accommodation requests was anything beyond that inherent in the workings of bureaucracy); Zaman v. Kelly Services, Inc., 2016 WL 5462706, *5 (N.D. Cal. Sept. 28, 2016)(evidence showed bureaucratic mistake, not discrimination); Branham v. Astrue, 2010 WL 419395, *5 (M.D. Ga. Jan. 28, 2010)(bureaucratic mistake recognized as legitimate non-discriminatory reason for challenged action).

procedure, there was no evidence that errors were motivated by discrimination). That being so, that another employee told plaintiff in 2007 that he had stolen money due to the overpayment and had to pay back in a lump sum is, properly considered, too remote to justify an inference that his termination nine years later, in 2016, was in any way discriminatory, particularly when the decisionmakers considered neither the overpayment nor the payment plan in their analysis of whether plaintiff had to be let go. See, Rademacher v. HBE Corp., 645 F.3d 1005, 1011 (8th Cir. 2011)(company president's expression of dissatisfaction three years earlier upon learning of plaintiff's enlistment in Air Force Reserve not probative of discrimination in part because in the subsequent three years, the company routinely granted plaintiff's requests for military leave, handling military absences without incident, and reinstating plaintiff when he returned from leave).[46]

Plaintiff maintains that coworkers joked "he was playing little soldiers" and "putting Armor All on the planes tires." See, USMF (Docket Non. 40-2, ¶ 130); Docket No. 47-1, pp. 16-17. He does not remember the names of the coworkers that allegedly made the comment or comments or if there were supervisors among them (Docket No. 47-1, p. 17).[47] Normally, stray remarks are insufficient to establish pretext or discriminatory animus. Their probativeness is circumscribed if they were made in a situation temporarily remote from the date of the employment decision at issue, or were not related to that decision, or were made by non-decisionmakers. See,

---

[46] Ms. Lugo ceased employment at Baxter on February 11, 2011. See, SUMF (Docket No. 40-2 ¶ 126). Without pointing to any evidence, plaintiff denies SUMF ¶ 126 as immaterial and unsupported by the specific paragraph of the statement under penalty of perjury that Baxter refers to, namely, Docket No. 40-3, at ¶ 62 (Docket No. 47, ¶ 126). Although the paragraph does not lend support to the statement, the statement is supported by the immediately preceding paragraph, at Docket No. 40-3, ¶ 61. Thus, the record supports Baxter's SUMF. As an aside, there is no evidence that Ms. Lugo or Ms. Valentín had any participation in the pre-termination investigation or the decisionmaking process resulting in the termination.

[47] As for the frequency, plaintiff said "… 15, 20, 25 times, what do I know" (Docket No. 40-4, p. 165).

Straughn, 250 F.3d at 36 (discussing topic).  And plaintiff cannot attribute any of the comments to the decisionmakers.  See, Ragland v. BM2 Freight Services, Inc., 2020 WL 4932835, *6 (6th Cir. 2020)(during plaintiff's employment with defendant, several coworkers, an HR manager, and a Vice-President asked him about his experiences in the military, including whether he had killed anybody and whether he had PTSD or any issues from his past military service, which plaintiff found "weird" and "awkward," but those questions did not support an inference that he was terminated because of his military service, as there was no evidence that the decisionmakers ever asked those questions); Rivera-Cartagena, 802 F.Supp.2d at 344 (allegedly discriminating comments regarding plaintiff's status as soldier discarded as evidence of employer's discriminatory animus, for they were made by employees who had no participation in plaintiff's termination).[48]

Plaintiff asserts that Ms. Lugo, Mr. Morán and/or Mr. Rodríguez called him while he was on a military leave to request information or a work task, such as preparing presentations.  See, SUMF (Docket No. 40-2, ¶ 125).[49]  As mentioned earlier, Ms. Lugo ceased working at Baxter on February 11, 2011.  See, SUMF (Docket No. 40-2) ¶ 126.  Mr. Morán was plant manager from 2008 to 2016 (Docket No. 40-16, ¶ 1).  Mr. Rodríguez only called plaintiff once while on military leave, on April 9, 2016, to inquire as to why he was not present at a company event- the Bamboo

---

[48] See also, Bennett v. Saint-Gobain Corp., 507 F.3d 23, 30 (1st Cir. 2007)("… Feagans was not the decisionmaker here.  Thus, whether or not he made discriminatory comments would not have affected the outcome (which turned on whether Mesher- the person responsible for the decision to terminate plaintiff's employment -acted out of a discriminatory animus.  Put another way, since Feagans had no part in the adverse employment decision, his comments, even if made, would constitute nothing more than stray remarks").

[49] As stated by plaintiff, sometimes he was called while on leave, and other times there were deadlines, a due date, as when the Company had visitors and he had to put in work (Docket No. 147-1, p. 15).

González-Santiago v. Baxter Healthcare S.A., *et al.*
Civil No. 16-2929 (PAD)
Opinion and Order
Page 40

Tennis Event -and did not assign him any work.  Id. at ¶ 127.[50]  Plaintiff did not suffer any disciplinary action for failing to attend the event.  Id. at ¶ 128.  As for how many times plaintiff claims he was called, he said "… I think that 15, 20, 25.  I do not know" (Docket No. 147-1, p. 13).[51]  Considering that he was employed in Baxter 23 years and was already in the military when hired, even the upper, albeit speculative, figure of 25 times – about once per year – is *de minimis*.

Then as well, the record is bereft of evidence that the callers were hostile or ever conditioned plaintiff's leaves or employment upon his willingness to remain "on call" for the employer; or that plaintiff objected to the calls, expressed any concerns over them, told Ms. Lugo, Mr. Morán or Mr. Rodríguez that he was not allowed to comply with their requests on account of being on military leave and notwithstanding that warning, the calls occurred again, however infrequently.  Nor is there evidence that the calls interfered in any way or manner with the leave; that plaintiff was threatened with adverse employment action if he did not comply with the caller's request; or that plaintiff missed military drills or exercises due to Baxter's pressure or requests for him do so in order to carry out civilian work.  Equally important, there is no suggestion that the requests for information or work tasks were unrelated to legitimate business goals or beyond plaintiff's job description or responsibilities.  And there is no proof that plaintiff ever complained about the calls to military authorities, to anyone over Ms. Lugo's, Mr. Morán's or Mr. Rodríguez's position, rank, or pay grade, or to anybody for that matter.

---

[50] Plaintiff allegedly said, "I'm at the drill, I cannot go," and Mr. Rodríguez replied, "Well, I will have to go there" (Docket No. 40-4, p. 30).  Plaintiff could not recall if there was anything else in that conversation.  Id.

[51] Plaintiff said there were times- which as to frequency suggests not always, or even most times -that he had to work at night (Docket No. 47-1, p. 162).  Yet he was not specific as to whether that meant an "all-nighter" or some minutes during the evening when he was done for the day.  Incidentally, he occupied managerial positions since 2003.  See, SUMF (Docket No. 40-2, ¶ 4).  And there is no indication that in those positions he only worked on a strict 8:00 or 9:00 a.m. to 5:00 p.m. schedule or that as a manager he was not expected to work- and did not work -after regular business hours.

González-Santiago v. Baxter Healthcare S.A., *et al.*
Civil No. 16-2929 (PAD)
Opinion and Order
Page 41

All things considered, plaintiff voluntarily performed what he was asked to do.  See,
Massey-Diez v. University of Iowa Community Medical Services, Inc., 826 F.3d 1149, 1158-1160
(8th Cir. 2016)(dismissing claim that employer interfered with plaintiff's FMLA leave, a leave
taken on account of a serious medical condition, because of lack of coercion or involuntariness,
for even though plaintiff performed work during medical leave, there was no evidence that
plaintiff's compliance with management's requests that she work during the leave were anything
but voluntary).  Thence, the circumstances do not show hostility towards plaintiff's military status,
much less that Baxter took it into account in deciding to terminate plaintiff's employment.
Demands of an employer that conflict with military service are not actionable under USERRA "in
the absence of evidence that the employer took an adverse employment action against the
employee for failing to meet them."  Bucley v. Peak6 Investments, LP, 827 F.Supp.2d 846, 857
(N.D. Ill. 2011).  No evidence to that effect was presented here.  So, plaintiff has not demonstrated
to any degree, hostility from decisionmakers or those who provided information to them, which
together with knowledge of plaintiff's military activity, could raise a genuine issue of material fact
precluding summary judgment.[52]

### iii.  Inconsistencies/Disparate Treatment

The record does not show any inconsistencies between the proffered reasons for
termination and other actions from Baxter.  The Company has terminated every employee who has
been proven to have intentionally used the corporate credit card for personal gain, and there is no
evidence that it has treated more favorably similarly situated employees outside of plaintiff's

---

[52] For completeness and plaintiff's benefit, the hostility angle is also examined below from the perspective of hostile
work environment in two different but related modalities, viz, retaliatory hostile work environment and hostile work
environment not tied to a retaliatory animus.

protected group.  See, Escher, 627 F.3d at 1029-1030 (dismissing USERRA claim in part because there was no evidence of disparate treatment between plaintiff and similarly situated employees); Dean, 2019 WL 3818774 at *7, *8 (dismissing USERRA claim in part for lack of evidence that employer treated other employees who had falsified records or been untruthful in an investigation more favorably than it treated plaintiff); McDuffie-Smithson, 2012 WL 3637736 at *1, *3 (dismissing race discrimination claim in case where employees outside of protected group who misused employer-issued credit cards by purchasing personal items were similarly terminated).[53] In addition, the material presented for examination shows consistency in the grounds asserted for termination.  See, Rademacher, 645 F.3d at 1011-1012 (dismissing discrimination claim under USERRA in part because employer's reasons for plaintiff's termination did not vary); Taylor v. Got Beer, Inc., 2007 WL 9754086, *5 (N.D. Ala. Aug. 22, 2007)(dismissing race discrimination claim in part because legitimate, nondiscriminatory reason articulated by employer for termination did not change).  Compare with, Hance, 645 Fed.Appx. at 365 (plaintiff established *prima facie* case inasmuch as employer gave conflicting accounts for not hiring him).

### iv.  Policies

Plaintiff posits that he was terminated in violation of Baxter's own policies and procedures, for the Company did not follow the P-Card Manual, which provides for a course of action predicated on progressive discipline, specifically: first offense (cardholder advised to stop using

---

[53] See also, Trahan v. Wayfair Maine, LLC, 957 F.3d 54, 64 (1st Cir. 2020)(dismissing ADA action in part because plaintiff's "so-called comparator evidence [was] insufficient to show that any of the situations about which she complaine[d] closely resembled the misconduct for which she was fired," and therefore, her attempted comparisons "faile[d] to create a genuine issue of material fact"); Benoit v. Technical Mfg. Corp., 331 F.3d 166, 174 (1st Cir. 2003)(rejecting discrimination claims of plaintiff unable to show that other similarly situated employees outside of the protected group were treated differently); Zapata-Matos v. Reckitt & Colman, Inc., 277 F.3d 40, 47-48 (1st Cir. 2002)(summary judgment dismissing discrimination claim of plaintiff whose employment terminated but could not show that employer treated him differently than it treated similarly situated employees).

card outside of policy and of card suspension and cancellation if case of further violations); second offense (three-month suspension of card, subject to reinstatement with cardholder's manager's concurrence); and third offense (permanent cancellation of card, removal of cardholder's buying authority, and "appropriate" disciplinary action) (Docket No. 40-10, p. 12).  He contends that because this would have been his first credit card misuse, he should not have been subjected to disciplinary action, much less termination (Docket No. 42, p. 8; Docket No. 46, p. 10).

Baxter follows the described procedure in situations where the P-Card is used for an authorized purpose but the amount paid exceeds the pre-established limit and no prior authorization is obtained (Docket No. 56-1, pp. 98, 132).[54]  But not when the card has been used for personal purposes or in case of fraud.  Id.[55]  In fact, the P-Card Manual specifies that use of the card for personal purchases is strictly prohibited; improper use could result in disciplinary action including termination of employment; and termination of employment and legal action may be taken in case of fraud (Docket No. 40-10, pp. 5, 12).[56]

Fraud is a "generic term," McClellan v. Cantrell, 217 F.3d 890, 893 (7th Cir. 2000), the most common type of which involves a deliberate misrepresentation or, what amounts to the same thing, "a deliberately misleading omission."  In re Wood, 503 B.R. 705, 711 (Bnkr. W. D. Wis. 2013).  It "may consist in acts, words, and suppression of material facts" with intent to deceive,

---

[54] See also, Sandra Muñoz' "Unsworn Statement under Penalty of Perjury" (Docket No. 40-7, p. 3, ¶ 14-15) (explaining policy).

[55] See also, Sandra Muñoz' "Unsworn Statement under Penalty of Perjury" (Docket No. 40-7, p. 4, ¶ 16)(explaining policy).

[56] Plaintiff avers that every P-Card purchase is supposed to have been approved (Docket No. 47, pp. 9-10), and around December 2015, his supervisor at the time, Mr. Luis Lora, had authorized him to make the tire purchases for the Company fleet.  Id. at p. 38.  True, but plaintiff's private vehicle was not part of Baxter's fleet.  See, SUMF (Docket No. 40-2, p. 19 n. 4).

Peter v. Peter, 637 N.W. 2d 865, 874 (Neb. 2002), and embraces all means that human ingenuity can devise and that "are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of truth." Cantrell, 217 F.3d at 893.

As applied, the P-Card Manual makes the cardholder responsible for ensuring proper card use and for all charged transactions; and requires the cardholder to attach original detailed receipts for all transactions and validate all purchases (Docket No. 40-10, pp. 3, 8). In kind, fraudulent conduct may befall on any point across this spectrum. And reviewing the facts, it was not unreasonable for the decisionmakers to conclude that plaintiff deliberately used the card for a personal purpose and lied to cover up the misconduct to deceive Baxter to go around the violation. See, Dean v. Eli Lilly and Company, 2019 WL 3818774, *8 (S.D.Ind. Aug. 14, 2019)(dismissing USERRA action where evidence indicated that the decisionmakers honestly believed that plaintiff falsified records by representing that she had verified entries when she had not in fact done so and was dishonest, not entirely candid during the investigation, and such misconduct constituted an immediately terminable offense).

Plaintiff claims that he should not have been penalized for fraud because he contacted Costco to resolve the situation in accordance with the P-Card Manual (Docket No. 42, p. 7). The Manual spells out under the header "Disputes," that if there is a problem or dispute resulting from the use of the P-Card, the cardholder should first attempt to resolve the problem directly with the supplier (Docket No. 40-16, p. 10). From Baxter's point of view, however, this procedure applies in cases of transactions that the employee did not make (Docket No. 56-1, p. 123). For this reason, in such cases, according to the Manual, the employee must first attempt to resolve the matter directly with the supplier, so as to have the supplier correct the situation and remove the disputed transaction from the statement, as it is the employee's contention that he did not make the disputed

González-Santiago v. Baxter Healthcare S.A., *et al.*
Civil No. 16-2929 (PAD)
Opinion and Order
Page 45

transaction.  Id.  But no such dispute cropped up in this case, for plaintiff did purchase the tires for

his personal car with the P-Card.

The employer has the prerogative to interpret the policies that it adopts, and where that

interpretation is reasonable, there is no occasion for judicial second-guessing.  See, Daumont-

Colón v. Cooperativa de Ahorro y Crédito de Caguas, 982 F.3d 20, 30 (1st Cir. 2020)(district court

supportably concluded that Credit Union interpreted its own policy according to the tenor of the

policy); Toland v. AT&T, 2011 WL 13177025, *15 (N.D.Ga. April 20, 2011)(recognizing

employer's interpretation of policy even though the employee's description could be read in the

manner that the employee suggested); Svienty v. Whirlpool, Corp., 408 F.Supp.2d 466, 476-477

(W.D.Mich. 2005) (fact that employer's policy did not expressly define the term "gross

misconduct" did not preclude employer from concluding that plaintiff's actions constituted gross

misconduct).[57]  Based on the facts before them, it was not beyond reason for the decisionmakers

to have interpreted Baxter's policies as opening the door to immediate termination.  See, Vega-

Ruiz, 2010 WL 5376124 at *5 (sustaining termination following plaintiff's use of corporate credit

card for personal matters; that, according to plaintiff, he could use the card for those matters as

long as expenses were excluded from the expenses that were to be paid by the company, did not

bypass the credit card policy's prohibition of using the credit card for personal expenses); Rossitto,

2014 WL 1047729 at *1-*3, *6 (dismissing action of plaintiff terminated for violating company's

Found Property policies by not immediately turning $50 that he found on the floor in front of a

cash register to management, the customer service counter or a cashier, as in the company's view,

its rules provided that any found property was presumed to be the company's property, and by

---

[57] See also, Escher, 627 F.3d at 1031 (noting in dismissing USERRA action, that decisionmaker's reading and interpretation of company policy to call for plaintiff's termination was honest and reasonable).

delaying turning in the $50 bill, plaintiff violated the policy); <u>Dean</u>, 2019 WL 3818774 at *8 (rejecting challenge to termination where employer considered falsification of company records and dishonesty in course of investigation, immediately terminable separate offenses under its polices).

Plaintiff believes that "framing" him under a fraud theory only came into being well after this litigation started, as in the answer to the complaint or amended complaint Baxter did not allege that plaintiff had incurred in fraudulent activity rather than on "misuse and/or misappropriation of company property and/or money in violation of company policies and regulations" (Docket No. 26, p. 8, ¶ M; Docket No. 46, p. 10).  Even so, the answer also states, among other things, that plaintiff was not subject to an adverse employment action in the workplace due to a discriminatory or retaliatory animus (Docket No. 26, p. 7, ¶ D); neither codefendants nor any of their officials, managers and supervisors discriminated or retaliated against plaintiff on account of his military status, for having engaged in an protected activity or for any other illegal reason, <u>id.</u> at ¶ E; the actions taken by codefendants regarding plaintiff's employment were based on legitimate and non-discriminatory and/or non-retaliatory reasons that were neither arbitrary, capricious, unlawful, nor related to any protected class of which plaintiff may be a part, or related to any protected activity in which plaintiff may have participated, <u>id.</u> at ¶ F; plaintiff cannot establish a valid claim under USERRA, <u>id.</u>, at ¶ H; plaintiff was terminated with just cause, <u>id.</u> at ¶ Q; and all decisions related to plaintiff's terms and conditions of employment, including termination, were based on legitimate, nondiscriminatory and nonretaliatory reasons, <u>id.</u> at ¶ II.  Those reasons include the ones that Baxter has provided evidence for, and take in plaintiff's misuse of the credit card for a personal purchase and lying to cover up that conduct, which, as has already been noted, may lead to immediate termination under the P-Card Manual.

Plaintiff adduces that Ms. Centeno did not verify the P-Card Manual (Docket No. 42, p. 7), the implication being that termination is suspect.  During her deposition, Ms. Centeno was asked if she had checked the Procurement Guidelines, and she answered "no" (Docket No. 47-3, pp. 21-22).  Yet she also testified that plaintiff used the P-Card to purchase tires for his personal car, failed to inform what he had done, and provided false information, lying during the investigation (id. at pp. 12, 15), which Ms. Centeno described as a very serious violation of Baxter's handbook and other policies.  Id. at 13.  Furthermore, addressing the same point in her unsworn statement under penalty of perjury, she expressed that plaintiff was dishonest and committed fraud (Docket No. 40-3, ¶ 47).  In the end, it is apparent that plaintiff's conduct falls squarely within the ambit of the P-Card Manual as an offense carrying termination irrespective of whether Ms. Centeno checked it out as part of the decision-making process.

Over and beyond that aspect of Baxter's body of administration, a single set of events may call into play different policies or rules.  On his detail, the P-Card Manual was not the only source of guidance to employee conduct within the Baxter organization.  Thereon, Baxter's Employee Manual, copy of which plaintiff received (Docket No. 40-4, pp. 53-54), applied as well.  And the Employee Manual includes within the category of major offenses that may result in termination as a first offense, to rob, steal or unduly appropriate the property of other employees, vendors, or of the company; falsification or alteration of documents or files; and refusal to fully cooperate in any investigation carried out by the company, a category that includes providing false, incorrect or incomplete information or omitting information regarding the investigative process. (Docket No. 40-26, pp. 2-3).

In this light, Ms. Centeno and the other decisionmakers understandably concluded that plaintiff stole or misappropriated money by using the P-Card to purchase tires for his personal

vehicle; falsified and/or altered documents when he submitted partial copies of the Costco receipts to Ms. Muñoz, which purposely omitted the details of the transactions; and provided false information during the course of the investigation, lying about the tire purchase and failing to disclose that he purchased the tires for his personal vehicle (Docket No. 40-2, ¶ 96).  Considering plaintiff's role in the organization, this made his continued employment untenable (id.), a sensible basis for termination.  See, Kepreos v. Alcon Laboratories, Inc., 520 Fed.Appx. 375, 376-377 (6th Cir. 2013)(termination in part for using company credit card for personal items and resorting to deception when confronted with problem); McDuffie-Smithson, 2012 WL 3637736 at *1, *3 (termination for charging personal items to employer's credit card and altering receipts to hide unauthorized purchases).[58]

Plaintiff understands there was no misappropriation because, given that he reversed the $1,373.59 transaction and debited the charge to his personal credit card, Baxter lost no money (Docket No. 46, p. 10).  Even so, the terms "steal" and "misappropriate" have been applied in the employment context to a relatively broad spectrum of employee impropriety.  See, Bradbury v. Manor Healthcare Corp., 182 F.3d 921, *1, *2 (7th Cir. 1999)(dismissing discrimination action brought by nursing home administrator terminated for misappropriation of company funds: she had requested and received $525 from corporate headquarters to purchase a washing machine for the nursing home but no machine was purchased, and she took the money to her home; her assertion that she had not misappropriated the funds but taken the money home for safe-keeping

---

[58] See also, Kursar v. Whatcom County, 232 F.3d 895 at *1-*2 (9th Cir. 2000)(dismissing USERRA action of employee who claimed that the employer fired him allegedly for his participation in the National Guard, as he was terminated for engaging in fraud and misrepresentation, which the employer's rules and regulations recognized as proper grounds for termination).

did not undermine the defendant's belief that she had misappropriated the funds); Carson v. Patterson Companies, Inc., 423 Fed.Appx. 510, 512 (6th Cir. 2011)(dismissing discrimination action brought by employee discharged for requesting an improper reimbursement, as the decisionmaker was convinced that plaintiff had stolen money from the company and violated the employer's prohibitions against theft, deception, and dishonesty).[59]   In like manner, that the employer recovered the money is not an impediment to termination.   See, Rossitto, 2014 WL 1047729 at *6 (turning down plaintiff's argument that he did not steal anything because he returned money that he had found on floor in front of cash register, albeit not immediately as called for in company policy).

As well, in principle, whether plaintiff subjectively intended to deceive Baxter is irrelevant. See, Hance, 645 Fed.Appx. at 366 ("We express no opinion as to whether Hance intended to deceive BNSF; that is not relevant to our evaluation … Rather, we are persuaded that BNSF proved, by a preponderance of the evidence, that it did not hire Hance because the discrepancies between his application materials and his actual work history suggested that he was dishonest"). In this sense, the relevant question is whether the decisionmaker honestly believes in the truth behind the reasons for termination.   See, Zapata-Matos, 277 F.3d at 45 (analyzing issue in the context of a Title VII claim); Porto, 2018 WL 3559103 at *6, *10 (same with respect to analysis of disability discrimination claim); Taylor, 2007 WL 9754086 at *5 (employer in good faith

---

[59] See also, Svienty, 408 F.Supp.2d at 476-477 (employer legitimately considered plaintiff's conduct of calling in sick and working for another company and then lying about it during investigation either theft or insubordination within meaning of employer's policy providing for immediate termination in case of gross misconduct, a term which applied to, among others, theft and insubordination); Taylor, 2007 WL 9754086 at *5 (characterizing as theft, plaintiff's charging customer's credit card for more money than customer had authorized); Chacon, 99 F.Supp.3d at 217-218 (noting reference to alleged practice of manager's allowing employees to leave office through the back door during work hours and permitting them to sign in early when they were coming in late as "stealing" company resources and equating the practice to "fraud").

believed that employee had done wrong and this belief was the reason for termination).  And taking note of the circumstances, the decisionmakers here honestly believed that plaintiff lied during the investigation to cover up the deliberate utilization of the company credit card for personal use.  In the workaday world, "not every personnel decision involving a false statement (or a cover-up) has to be treated as something like a trial for perjury."  Total System Services, Inc., 221 F.3d at 1176.  In these situations, the employer is entitled to rely on its good faith understanding about the falsity, concealment, and so forth.  Id. [60]

Plaintiff takes issue with the employer's ascription of deception to his conduct, stating that he furnished Ms. Muñoz the documents that she requested from him; and as a result, she was able to reconcile the receipts and the purchase as part of her auditing process and had no need to look any further into the transaction (Docket No. 46, p. 10).  What plaintiff gave Ms. Muñoz may have been sufficient to reconcile the papers, but that particular accounting exercise is not the functional equivalent of vouching for the purchase's legitimacy, in other words, of certifying that the underlying purchase was for an authorized purpose.  To this extent, the reconciliation did not cancel out the fact that Ms. Muñoz had to follow up with plaintiff to provide her with the original receipts; he told Ms. Muñoz that he had lost the original receipts, and would go to Costco to obtain new copies of the receipts; and on March 10, 2016, finally produced sales audit transaction reports, showing a purchase in the amount of $749.19, another in the amount of $1,373.59, and a third in the amount of $1,373.59, a credit applied to plaintiff's P-card on February 24, 2016, the same day Baxter received Mr. Haddock's tip and began the investigation regarding the Costco purchases.

---

[60] See also, Carson, 423 Fed.Appx. at 512 (that employee discharged for requesting improper reimbursement claimed he never blatantly falsified the expense report did not detract from decisionmaker's belief that he had stolen money from the company and violated the company's prohibitions against theft, deception, and dishonesty).

González-Santiago v. Baxter Healthcare S.A., et al.
Civil No. 16-2929 (PAD)
Opinion and Order
Page 51

And it does not wipe out Mr. Morán's reasoning and conclusion and Mr. Frese's findings and rationale.

Plaintiff argues there was a mistake (Docket No. 46, p. 10).  His posture does not override the decisionmaker's honest belief about the facts underpinning the termination.  Where the employer's investigation "produces contradictory accounts of significant historical events, the employer can lawfully make a choice between the conflicting versions – that is, to accept one as true and to reject the other as fictitious – at least as long as the choice is an honest choice."  Total Systems Services, Inc., 221 F.3d at 1176.  Thus, in the event an employee is discharged based on a complaint lodged by another employee, the focus turns on the extent to which the employer reasonably believed the complaining employee's allegation and acted on it in good faith.  See, Johnson v. Barr Air Patrol, L.L.C., 2009 WL 854807, *8 (N.D.Tex. March 31, 2009)(explaining concept).[61]  Here, the investigators did not believe plaintiff, concluding instead that he engaged in misconduct; and the decisionmakers found their judgment apt.  See, Ronda-Pérez v. Banco Bilbao Vizcaya Argentaria-Puerto Rico, 404 F.3d 42-43, 45-46 (1st Cir. 2005)(dismissing discrimination claim of a branch manager who denied the misconduct underlying his termination in a case where the investigator deemed the informants credible).

As there is factual support for the decisionmakers' determination and the investigators' findings and conclusions, plaintiff had to present probative evidence that decisionmakers did not genuinely believe the investigators account of the events.  But he did not do so.  See, Anderson v. McDonald's Restaurants of Louisiana, Inc., 2012 WL 5878731, *6 (E.D.La. Nov. 21, 2012)

---

[61] See also, Elrod v. Sears, Roebuck and Co., 939 F.2d 1466, 1470 (11th Cir. 1991)("The inquiry … is limited to whether Rives, Malone and Merrill believed that Elrod was guilty of harassment, and if so, whether this belief was the reason behind Elrod's discharge").

("Anderson fails to rebut McDonald's asserted reasons for her termination [that she violated company policy by sending the text messages at issue].  She has not submitted any evidence, beyond her own testimony denying that she sent the text messages, [and] that McDonald's did not act in good faith and did not reasonably believe she sent the texts"); Johnson, 2009 WL 854807 at *8 ("Because [p]laintiff has failed to produce sufficient evidence showing that Barr did not reasonably believe the complaints about the alleged errors in his pipeline reports and act on them on good faith, the Court finds [p]laintiff's evidence regarding the customer complaints fails to raise a genuine issue of material fact of discriminatory intent").  In consequence, no genuine issue exists on this matter.  See, Porto v. Chevron NA Exploration and Production Company, 2018 WL 3559103, *3, *9, *10 (S.D. Tex. July 24, 2018)(plaintiff terminated in part because of her misuse of company's credit card – the P-Card – and false statements; her version that she did not purposefully purchase software for personal use with the card, and fact that as soon as she became aware of the charge she had it removed from her P-Card account, considered insufficient to prevent entry of summary judgment); Taylor, 2007 WL 9754086 at *3, *5 (termination for unauthorized credit card charge notwithstanding fact that plaintiff claimed the charge was a mistake); Daumont-Colón, 982 F.3d at 32 (judgement as a matter of law where none of the evidence in record was capable of grounding a reasonable inference that the Credit Union did not believe plaintiff had violated its rules and terminated her for that reason).

Plaintiff mentions that he was not given the opportunity to explain the mistake during the meeting with Ms. Centeno and Mr. Frese (Docket No. 47, pp. 34-35; Docket No. 58-1, pp. 41-42).[62]  He understands he was deprived of due process in the course of the meeting by not being

---

[62] Plaintiff claims that he was not given an opportunity to sit down with Ms. Centeno (Docket Non. 48-4, p. 61).  Still, he admitted that Ms. Centeno was present when Mr. Frese interviewed him (Docket No. 47, ¶ 85).

allowed to state his position with respect to the BWM tire purchase (Docket No. 47, p. 63).  In

opposing summary judgment, however, he declared that in that meeting he said the $1,373.59

transaction was a mistake; denied having used the P-Card for personal gain; explained that at the

same time he was changing tires for the company cars he did a transaction for himself and that he

did not have a chance to see the receipts; and that when he eventually noticed that the personal

purchase was on the P-Card, he went to Costco to reverse the transaction (Docket No. 47, pp. 41-

42.  Further, he said that the cashier was wrong.  Id. at 43.[63]

Yet, taking for granted that plaintiff was not allowed to say what he wished to state in the

meeting, that would not undermine the validity of the termination.  See, Jarjoura v. Ericsson, Inc.,

266 F.Supp.2d 519, 526, 530, 533 (S.D.Texas 2003)(dismissing FMLA retaliation action filed by

employee discharged for misuse of corporate credit card in spite of the fact that he was not

provided with the opportunity to explain the circumstances related to the abuse, and plaintiff could

not dispute the facts underlying the termination); Taylor, 2007 WL 9754086 at *3, *5 (dismissing

discriminatory termination action based on race even though employer did not provide plaintiff

with the opportunity to prove that unauthorized credit card charge was a mistake, and plaintiff did

not present evidence that her race had anything to do with decisionmaker's evaluation of the

situation).  Like that, this does not cast doubt on Baxter's decision.  In the final analysis, plaintiff's

package of proof is insufficient to link membership or participation in the military to the

termination and to establish a *prima facie* case of discrimination under USERRA.

---

[63] Plaintiff alleges that he took two cards at the time of payment and gave them both to the cashier, who made a mistake charging all purchases to the same card- the P-Card (Docket No. 47, p. 43), albeit during his deposition he said that he was not 100 percent sure he gave the cashier two cards (Docket No. 42-2, p. 25).  And Mr. Haddock saw one card: the P-Card.

### b.  Second Prong: Affirmative Showing

On another level, assuming that plaintiff met his burden of establishing a *prima facie* case, his claim nonetheless fails.  Defendants contend the record shows that plaintiff's termination was not pretextual and that he would have been terminated notwithstanding his military status (Docket No. 40-1, pp. 14-18).  Plaintiff counters that he was "absent from work because of his military service, and USERRA protects against removal for that reason and any other reason related to [his] military activity" (Docket No. 46, p. 13).  He does not, however, challenge defendants' evidence. Instead he states that defendants' contentions are unsupported, inconsistent and contradictory, and thus "incredible and unworthy of belief," concluding that pursuant to USERRA's policy of liberal interpretation in favor of military members, the ultimate question of intent should be left for the jury.  Id.  Against this background, defendants have shown that there are no genuine, material facts to dispute that plaintiff's termination was legitimate and would have occurred regardless of his military status.

To repeat, plaintiff was discovered to have purchased a set of tires for his personal vehicle using his corporate credit card.  After a co-worker voluntarily tipped-off Baxter of the transaction, the employer initiated an internal investigation, concluding that plaintiff made the purchase intentionally and then attempted to cover up his conduct, lying and omitting critical information during the course of investigation.  In doing so, he was found to have committed three major offenses to the Employee Manual, including alteration of documents, providing incorrect or incomplete information or omitting information, and misappropriation of company property,

offenses carrying immediate termination.[64]  The employer has terminated all employees found to have intentionally used the corporate cards for personal gain.[65]

Pretext may be found where there are "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in an employer's proffered reasons for termination "that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."  Bonefont-Igaravidez v. International Shipping Corp., 659 F.3d 120, 124 (1st Cir. 2011).  But there are no such weaknesses, implausibilities, inconsistencies, or contradictions here.  Bold assertions of discrimination are inadequate to support a finding of "proscribed discrimination."  Williams v. CVS Pharmacy, Inc., 2012 WL 3150780, *17 (E.D. Tex. Aug. 2, 2012).

On this record, plaintiff's military status or activities were not a factor in his termination.  Still and all, the reasons for termination would have led Baxter to take the same adverse action notwithstanding that status and related activities.  See, Escher, 627 F.3d at 1030-1031 (assuming plaintiff could make out a *prima facie* case, employer showed that it would have terminated him anyway for a valid reason – doing naval reserve work during company time with company resources – as the employer decided to terminate plaintiff's employment based on an honestly held

---

[64] As discussed, on these same set of facts- the facts that the decisionmakers have consistently focused on -the P-Card Manual leads to the same result: immediate termination.

[65] Plaintiff denies this (Docket No. 47, p. 68, ¶ 121).  Referring to Ms. Muñoz' deposition, plaintiff states that Ms. Muñoz has never suspended an employee or withheld a P-Card because of misuse.  Id.  The observation does not help plaintiff.  At the deposition, Ms. Muñoz was asked whether during her tenure as P-Card auditor she had any situation that she picked up from audits that required the suspension or withholding of the P-Card from the card-holder, to which she answered "no" (Docket No. 42-4, p. 8, lines 13-17).  As previously discussed, audit reconciliation is not the functional equivalent of vouching for the purchase's legitimacy, in other words, of certifying that the underlying purchase was for an authorized purpose.  In the same way, such unauthorized purpose may be fraudulent, and fraud may lead to termination.  Therefore, Ms. Muñoz' deposition testimony does not serve to negate that Baxter has terminated all employees found to have intentionally used their corporate cards for personal gain.  See, Mr. Frese's "Unsworn Declaration under Penalty of Perjury" (Docket No. 40-23, p. 6, ¶ 25)(referring to terminations under those circumstances).

belief in the nondiscriminatory reason, supported by particularized facts after a reasonably thorough investigation); Hance, 645 Fed.Appx. at 366 (notwithstanding the fact that plaintiff proved a *prima facie* case, defendant showed it believed plaintiff was dishonest, and that belief, standing alone, would have induced it not to offer plaintiff the position he had applied for); Dean, 2019 WL 3818774 at *7, *8 (even if plaintiff could prove that her military service motivated in part termination decision, employer showed plaintiff would have been terminated regardless of her military affiliation for falsifying records by representing that she had verified entries in documents when she had not in fact done so, and then was unforthcoming in the subsequent investigation).[66] Compare with, Grosjean v. Firstenergy, 481 F.Supp.2d 878, 883-884 (N.D. Ohio 2007) (insufficient evidence that plaintiff's rating would have been the same without consideration of his military service because when references to plaintiff's time away from employment on account of military service were removed, there was little left in the evaluation).   By contrast to this latter case, it is apparent that protected status and activity were totally absent from the decision-making process leading to plaintiff's termination.   Therefore, the USERRA discrimination claim must be dismissed.

## 1.  **Retaliation**

Plaintiff alleges that he was retaliated against due to his military status and service and for opposing unlawful actions in violation of USERRA (Docket No. 23, ¶ 44).   The statute prohibits the employer from taking an adverse employment action against any person because that person: (1) has taken an action to enforce a protection afforded any person under USERRA; (2) has

---

[66] See also, Wooldridge v. City of Melbourne, 212 F.Supp.3d 1205, 1210-1212 (M.D. Fla. 2015)(summary judgment dismissing USERRA failure to promote claim despite plaintiff's shouldering initial burden).

testified or otherwise made a statement in connection with any proceeding or assisted or otherwise participated in an investigation thereunder; (3) has assisted or otherwise participated in an investigation under USERRA; or (4) has exercised a right provided for in USERRA. See, 38 U.S.C. 4311 (b)(codifying prohibition). From there, it states that the employer shall be considered to have engaged in actions prohibited by this provision if the person's (A) action to enforce a protection afforded any person under USERRA; (B) testimony or making of a statement in or in connection with any proceeding under the statute; (C) assistance or other participation in an investigation under thereunder; or (D) exercise of a right provided for in USERRA, is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such person's enforcement action, testimony, statement, assistance, participation, or exercise of a right. Id. § 4311(b). The prohibition applies with respect to a person regardless of whether that person has performed services in the uniformed services. Id.

As with discrimination actions, to make out a USERRA retaliation claim, plaintiff bears the initial burden of showing, by a preponderance of the evidence, that "his protected status was a motivating factor in the adverse employment action." Escher, 627 F.3d at 1026. In a similar vein, protected status is a motivating factor if a truthful employer would list it, if asked, as one of the reasons for its decision. Id. And in the same way, prohibited motivation can be inferred from a variety of sources, including proximity between protected activity and the adverse employment action; an employer's expressed hostility toward members protected by the statute together with knowledge of the employee's military activity; inconsistencies between the proffered reason and other actions of the employer; and disparate treatment of certain employees compared to other employees with similar work records or offenses. See, Escher, 627 F.3d at 1026 (enumerating sources of inference). If the plaintiff meets the initial burden, the employer has the opportunity

'to come forward with evidence to show, by a preponderance of the evidence, that it would have taken the adverse action anyway, for a valid reason.' Hance, 645 Fed. Appx. at 365. Id. Plaintiff does not carry the day.

First, for the reasons discussed in connection with the discrimination claim, plaintiff has not come up with a *prima facie* case of retaliation, and even if he were considered to have done so, Baxter has shown by a preponderance of the evidence that what motivated the decisionmakers and led them to terminate plaintiff's employment was the fact that he used the corporate credit card for a personal purpose and lied during the investigation to coverup the prohibited transaction. Baxter knew that he was in the military, but considering the facts, that was of no consequence, as there is no basis to conclude that the decisionmakers did not honestly believe the grounds they relied on for their decision, and those grounds are totally unrelated to military status. See, Rivera-Cartagena, 802 F.Supp.2df at 343 (even though the employer knew that plaintiff was in the National Guard, plaintiff did not set forth facts that could lead the court to conclude that employer's decision to terminate his employment was taken because of plaintiff's military status rather than because of plaintiff's violation of the employer's strict alcohol and drug abuse policy).

Second, equally important, the decisionmakers did not know that plaintiff had been in a military drill when they made the decision at issue. A person "cannot have been motivated to retaliate by something he was unaware of." Medina-Rivera v. MVM, Inc., 713 F.3d 132, 139 (1st Cir. 2013).[67] Thus, the claim of retaliation resulting from the drill fails. See, Vega-Colón, 625 F.3d at 33 (sustaining dismissal of USERRA retaliation action in absence of evidence that the person or persons involved in the adverse employment action were aware of a complaint that the

---

[67] See also, O'Rourke v. Tiffany and Company, 988 F.3d 23, 25 (1st Cir. 2021)(a plaintiff must show that the retaliator knew about protected activity to demonstrate that he was fired in retaliation for that activity).

González-Santiago v. Baxter Healthcare S.A., et al.
Civil No. 16-2929 (PAD)
Opinion and Order
Page 59

employee had filed with the United States Department of Labor, Veterans' Employment and

Training Service); Escher, 627 F.3d at 1026-1027 (dismissing USERRA retaliation claim in part

because decisionmaker had no knowledge of plaintiff's complaints about military leave).[68]  While

a retaliation claim may have merit independent of the underlying discrimination claim, that is not

the case here, where so far as termination is concerned, both claims rest on the same underlying

conduct.

Third, approaching the retaliation issue from a different angle, plaintiff asserts that in 2007,

the former Human Resources Director – Angie Lugo – and a Human Resources Manager- Evelyn

Valentín -told him he was not protected by USERRA and created a hostile work environment

towards him, which lead him to oppose Lugo's actions and contentions (Docket No. 23, ¶¶ 29,

44).  As previously mentioned, in 2007 Baxter mistakenly overpaid plaintiff while he was on

military leave, the only time overpayment had occurred or would occur.  He claims that Lugo and

Valentín told him he stole the money that he collected over what he should have received, and had

to refund it in a lump sum; he responded he was protected by USERRA; they said he was not, and

tore up a vacation slip.  The Plant Manager became involved; a payment plan was adopted; and

the issue was resolved to plaintiff's satisfaction in 2007.

As spoken of earlier, there was no discrimination in requiring plaintiff to reimburse Baxter

what the company had mistakenly overpaid, and much less so, to do it by way of a plan that plaintiff

---

[68] See also, Evans v. Professional Transp., Inc., 614 Fed.Appx. 297, 303 (6th Cir. 2015)(dismissing retaliation claim given absence of evidence that decisionmaker had knowledge of plaintiff's protected activity); Culton v. Missouri Dept. of Corrections, 515 F.3d 828, 831 (8th Cir. 2008)(failure to present evidence that the decisionmaker was aware of the employee's protected activities fatal to retaliation claim); Frazier v. USF Holland, Inc., 250 Fed.Appx. 142, 148 (6th Cir. 2007)(commenting in dismissing retaliation claim that to survive a summary judgment motion, a plaintiff must put forward more than speculation or intuition)(citing Mulhall v. Ashcroft, 287 F.3d 543, 552 (6th Cir. 2002))(holding that plaintiff failed to establish knowledge on the part of the decisionmaker where plaintiff did not produce evidence, direct or circumstantial, to rebut evidence that decisionmaker had no knowledge of protected activity and plaintiff offered only conspiratorial theories, not the specific facts required under Fed.R.Civ.P. 56)).

was satisfied with. Yet it is unclear how plaintiff was informed of the mistake. But assuming in plaintiff's favor that Lugo and Valentín informed him of the overpayment; he told them that USERRA protected him; they reacted saying it did not, that he stole the money, and had to repay it in a lump sum, tearing up a vacation slip; and plaintiff objected to their reaction, the interaction does not gain admittance to the realm of cognizable retaliation.

In general, retaliation involves protected conduct; an adverse employment action; and a causal connection between the protected conduct and the adverse action. See, Colón-Fontánez v. Municipality of San Juan, 660 F.3d 17, 36 (1st Cir. 2011)(itemizing elements); Lockridge v. The University of Maine, 597 F.3d 464, 473 (1st Cir. 2010)(similar). Anti-retaliation provisions "protect[ ] individual[s] not from all retaliation, but from retaliation that produces an injury or harm." Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006). This means plaintiff must show that a reasonable employee would have found the challenged action materially adverse. Id. at 68 (so holding under Title VII); Lisdahl v. Mayo Foundation, 633 F.3d 712, 721 (8th Cir. 2011)(applying materiality requirement to USERRA retaliation claim). For retaliatory action to be material, it must produce "a significant, not trivial harm." Colón-Fontánez, 660 F.3d at 36. And a hostile work environment qualifies as such an action. See, Noviello v. City of Boston, 398 F.3d 76, 91 (1st Cir. 2005)(holding that "subjecting an employee to a hostile work environment in retaliation for protected activity constitutes an adverse employment action").

In this model, the employer's response to the employee's protected activity must be sufficiently "severe or pervasive" to alter the conditions of employment and create an abusive work environment. Alvarado v. Donahoe, 687 F.3d 453, 461 (1st Cir. 2012). The abuse must be both objectively offensive (viewed from a reasonable person's perspective) and subjectively so (as perceived by the plaintiff). Id. To appraise the environment, courts examine all circumstances,

González-Santiago v. Baxter Healthcare S.A., *et al.*
Civil No. 16-2929 (PAD)
Opinion and Order
Page 61

including "the frequency of the conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with plaintiff's work performance." Vega-Colón, 625 F.3d at 32.

On the assumption that plaintiff engaged in protected activity and Lugo's and Valentín's reaction was causally linked to the same activity, plaintiff has not met the burden to establish that the asserted retaliatory conduct configured a hostile work environment. While the record shows plaintiff found the comments and gesture subjectively offensive, they do not constitute objectively offensive conduct. See, Morris v. Conagra Foods, Inc., 435 F.Supp.2d 887, 893, 907 (N.D. Iowa 2005)(dismissing hostile work environment claim of employee the human resources manager called a "thief" when he informed plaintiff that due to an accounting error he had been mistakenly overpaid a substantial sum of money and upon learning this information, plaintiff refused to reimburse the company for the overpayment); Wade v. Donahoe, 2012 WL 3844380, *9 (E.D. Pa. 2012)(dismissing hostile work environment claim of employee who, among other things, complained that manager tore up a leave slip in front of her).[69] Compare with, Noviello, 398 F.3d

---

[69] See also, Fontánez-Núñez v. Janssen Ortho LLC, 447 F.3d 50, 53, 56-57 (1st Cir. 2006)(that in one year supervisor called plaintiff "gray haired," said that plaintiff looked like a certain co-worker who was considered to be slow and incompetent, and noted that plaintiff was a pharmacist and all pharmacists are homosexuals; coworkers asked plaintiff if he was gay and called him cockatoo because of his gray hair, not severe or pervasive enough to establish a hostile work environment); Alvarado, 687 F.3d at 461-462 (no hostile work environment in out of three incidents in one year during which a supervisor derisively told plaintiff's coworkers to give plaintiff the pill, presumably mocking the fact that plaintiff audibly sang to himself while working; in another instance the supervisor told plaintiff that he would put plaintiff to work with his family, which plaintiff understood as a threat to his continued employment, after plaintiff brought corn sticks for his coworkers; and when plaintiff showed a different supervisor an FMLA document which referenced his schizoaffective condition, the supervisor told him "crazy, crazy, you're crazy;" even though the supervisors were aware of plaintiff's psychiatric condition; albeit the comments were callous and distasteful, they were not severe or pervasive enough to establish an objectively hostile or abusive work environment ); Colón-Fontánez, 660 F.3d at 44-45 (that, among other things, the supervisor once threw plaintiff and a co-worker out of her office, yelling at them in front of other employees; when plaintiff left her desk to go to the bathroom, the supervisor or someone designated by her would follow her; and co-workers told plaintiff on several occasions to get on social security or apply for disability so that she could receive an assured check; called her a hypochondriac; and claimed she was faking it, did not raise to the level of severity or pervasiveness necessary to create a hostile work environment).

at 93-94 (finding retaliatory hostile work environment where plaintiff was subjected to a steady stream of abuse over the course of several months, was falsely accused of misconduct, and was subjected to work sabotage, exclusion, and denial of support).   Further, the incident was isolated, from the record it was not physically threatening, and there is no evidence that it unreasonably interfered with plaintiff's work performance.   See, Colón-Fontánez, 660 F.3d at 44-45 (noting in rejecting hostile work environment claim that incidents at issue were episodic, but not frequent; upsetting, but not severe; mildly humiliating, but not physically threatening; and did not appear to have affected plaintiff's overall work performance); Fontánez-Núñez, 447 F.3d at 56-57 (in turning down hostile work environment claim, characterizing objectionable language as mere offensive utterances that did not unreasonably interfere with plaintiff's work performance).[70]   In a word, what plaintiff complains of is not serious enough to dissuade a reasonable employee from engaging in protected activity.[71]   Thus, Lugo's and Valentín's allegedly retaliatory animus did not result in a material adverse action.   On these facts, the USERRA retaliation claim must be dismissed.

## 2.  **Hostile Work Environment**

To bridge the previous section with the one here, retaliatory hostile work environments are linked to a retaliatory animus motivated by a discrete intention to punish a person who has complained about an unlawful employment practice or engaged in protected activity.   See, Noviello, 398 F.3d at 87 (discussing topic); Alvarado, 687 F.3d at 459 (noting that only those

---

[70] Plaintiff described his performance at Baxter as "one of excellence" (Docket No. 40-4, pp. 40-41).

[71] In fact, after the incident in 2007, plaintiff went on military drills and leaves of absence for the next nine years, until his employment terminated in 2016.

González-Santiago v. Baxter Healthcare S.A., *et al.*
Civil No. 16-2929 (PAD)
Opinion and Order
Page 63

actions directed at the employee that stem from a retaliatory animus may be factored into the

retaliatory hostile work environment calculus).  That is the animus that plaintiff attributed to Ms.

Lugo and Ms. Valentín, which, as already discussed, did not translate into a retaliatory hostile

work environment.  Retaliatory animus, however, is different than the animus that drives other

types of harassment.  See, Noviello, 398 F.3d at 87 (distinguishing between both categories of

harassment).  And plaintiff mentions instances of perceived hostility not linked to a retaliatory

animus.

With that, plaintiff says that coworkers joked "he was playing little soldiers" and "putting

Armor All on the planes tires."  He does not remember the names of the coworkers that allegedly

made the comment or comments.  See, SUMF (Docket Non. 40-2), ¶ 130; Docket No. 40-4, pp.

162-164.[72]  According to him, the comments were made "… 15, 20, 25 times, what do I know"

(Docket No. 40-4, p. 165).  Besides, he asserts that he was asked to provide information or prepare

reports and presentations for Baxter while he was on military leave (Docket No. 47-1, p. 13).  As

for frequency, he said "… 15-20-25 times.  I do not know."  Id.  The court discounted the comments

as stray remarks with respect to the termination, and the work tasks as de minimis, not in conflict

with USERRA.  But even put together, they do not configure a hostile work environment.[73]

A hostile work environment consists of "harassing behavior sufficiently severe or

pervasive to alter the conditions of his employment."  Vega-Colón, 625 F.3d at 32.  The behavior

is gauged in light of all attendant circumstances.  Id.  The harassment must be both subjectively

---

[72] Plaintiff could not say the coworkers made the comments with a bad intention or bad faith (Docket No. 47-1, p. 18).

[73] Neither the Supreme Court nor the First Circuit has decided whether a hostile work environment claim is cognizable under USERRA.  See, Vega-Colón, 625 F.3d at 32 (addressing issue while assuming without deciding that it is); Vega-Colón, 2020 WL 4548120 at 15 (same).  Following the First Circuit's lead, the court assumes USERRA proscribes hostile work environments.

and objectively offensive.  Id.  Conduct that is not severe or pervasive enough to create an objectively hostile or abusive working environment, an environment that a reasonable person would find hostile or abusive, "is beyond statutory purview."  Echevarria v. AstraZeneca, 133 F.Supp.3d 372, 404 (D.P.R. 2015), *aff'd* 856 F.3d 119 (1st Cir. 2017).  Making allowance for comparable cases, the circumstances of this case do not reflect a hostile work environment.

First, even though plaintiff found the comments derogatory, they were not severe.  See, Vega-Colón, 625 F.3d at 31-34 (referring to plaintiff as "soldier," "little soldier," and "sergeant," and asking him if his military training was similar to the one in the American military movie "Rambo," not objectively offensive or humiliating, so that "[o]bjectively viewed, the name calling directed at [plaintiff] was not … severe"); Kassel v. City of Middletown, 272 F.Supp.3d 516, 542 (S.D. N.Y. 2017)(comment from a lieutenant in fire department that plaintiff "spent most of his time sitting at Air National Guard doing nothing" was rude and unbecoming of a colleague, but not sufficiently severe).[74]  As well, there is no evidence that what work plaintiff did for Baxter while on leave was beyond his job description or was more than minimally annoying.  See, Morales-Vallellanes v. Potter, 605 F.3d 27, 38 (1st Cir. 2010)(a minor disruption caused by tasks within plaintiff's job description is not a change in the terms, conditions or privileges of employment).[75]

---

[74] See also, Hilt-Dyson v. City of Chicago, 282 F.3d 456, 463, 465-466 (7th Cir. 2002)(although employee considered incidents demeaning and degrading, conduct was not severe enough to constitute actionable harassment).

[75] As mentioned before, plaintiff said "there were times"- which suggests that it was not always, or even most of the time -that he had to work at night (Docket No. 47-1, p. 162).  He was not specific as to whether that meant an "all-nighter" or some minutes during the evening when he was done for the day.  And even though he occupied managerial positions at Baxter since 2003 (Docket No. 40-2, ¶ 4), there is no evidence that in those positions he only worked on a strict 8:00 or 9:00 a.m. to 5:00 p.m. schedule or that as a manager he was not expected to work- and did not work - after regular business hours.

Second, the comments were not pervasive.  See, Vega-Colón, 2020 WL 4548120 at 16 (responding to plaintiff's request for assistance with his workload with, "[a]ren't you in the army" was rude, but not significantly degrading, and considering that it occurred about ten times a year, when plaintiff had to go out on military leave, it was more indicative of occasional instances of rudeness than of pervasiveness).  In the same vein, taking plaintiff's upper speculative numbers as a fact here, it would mean 25 allegedly objectionable comments and 25 times he did some work for Baxter while on leave in 23 years of employment, or about one comment and request for work per year, significantly less than the ten comments a year that the court found inadequate to support a hostile work environment claim in Vega-Colón, 2020 WL 4548120 at *16.  This was not pervasive but de minimis or slight.  See, Mock v. City of Rome, 851 F.Supp.2d 428, 430-431, 434 (N.D.N.Y. 2012)(that between 1992 and 1995, Deputy Chief of Police called plaintiff's wife to inquire about the legitimacy of his Reserve duties; contacted plaintiff's Reserve unit asking for personnel records; sent plaintiff a memorandum for the name of the commanding general, for he wished to advise the general of plaintiff's lack of professionalism; and in 2005, the Chief of Policy said that plaintiff was always out playing war games, were not so severe or pervasive enough to constitute a hostile working environment, particularly in light of the number of years over which those acts occurred).

Third, plaintiff has not pointed to any evidence that the comments or tasks were physically threatening or unreasonably interfered with his performance- either in Baxter or in the military - elements that seriously undercut the assertion that he worked in a hostile work environment.  See, Vega-Colón, 625 F.3d at 32-33 (dismissing hostile work environment claim under USERRA taking into account that complained of name calling was not physically threatening and did not interfere with plaintiff's work performance to an extent that was unreasonable or that altered the

conditions of his employment); Ayala-Sepúlveda v. Municipality of San Germán, 671 F.3d 24, 31

(1st Cir. 2012)(dismissing hostile environment action in part because plaintiff presented almost no

evidence to suggest that the alleged harassment unreasonably interfered with his work

performance); Bhatti v. Trustees of Boston University, 659 F.3d 64, 71 (1st Cir. 2011)(dismissing

claim of plaintiff who pointed to no effect of alleged hostile work environment upon her work

performance); Pomales, 447 F.3d at 83 (no hostile work environment in part because plaintiff

presented no proof that complained of conduct negatively affected her ability to work). Thus, the

hostile work environment aspect of the case cannot be sustained.

## B. **Puerto Rico Law**

### a. **Law 62**

Plaintiff alleges that Baxter violated Law 62 (Docket No. 23, ¶ 47; Docket No. 46, p. 13).

Law 62 is Puerto Rico's "counterpart" to USERRA. Barreto v. ITT World Directories, Inc., 62

F.Supp. 2d 387, 388 (D.P.R. 1999). It seeks "to protect the members of the military forces of

Puerto Rico from being dismissed or discriminated against because of their military status."

Rivera-Cartagena, 802 F.Supp.2d at 342 (so observing). On that account, it defines the term

"military forces of Puerto Rico" as the "National Guard of Puerto Rico and any other military force

organized under the laws of the Commonwealth of Puerto Rico." P.R. Laws Ann. tit. 25 §§ 2002,

2084.

As plaintiff initially served in the U.S. Army and subsequently in the U.S. Air Force

Reserve, the statute does not apply here. See, Rivera-Meléndez v. Pfizer Pharmaceutical, Inc., 747

F.Supp.2d 336, 339 & n. 3 (D. P. R. 2010)(concluding that Law 62 did not support claim brought

by a plaintiff whose position was eliminated while he was deployed because he served in the U.S.

Navy, not in a military force organized under the laws of Puerto Rico). If Law No. 62 applied,

however, it would not sustain the action because, as discussed above in connection with USERRA, plaintiff was not terminated by reason of his military status or on account of military activities. See, Rivera-Cartagena, 802 F.Supp.2d at 347 (holding that where termination was legitimate and regardless of military status, claims under both USERRA and Law No. 62 fail). Hence, the Law No. 62 claim must be dismissed.[76]

### b. **Law 203**

Plaintiff alleges that Baxter violated Law No. 203 (Docket No. 23, ¶ 47; Docket No. 46, p. 13). Law 203, titled "Bill of Rights of the Puerto Rican Veteran for the 21st Century," provides that employers have the obligation to "[r]einstate a veteran or reservist to the same position or work he/she was performing when he/she was called to active service or voluntarily joined the Armed Forces, or to an equal or similar position, if the veteran formally requests his employer to do so within one hundred and eighty (180) days following his/her honorable discharge from the Armed Forces." P.R. Laws Ann. tit. 29 § 737(f)(B).

Seen in this light, to successfully assert a claim under Law 203, plaintiff would have to show that he: (1) was honorably discharged from the Armed Forces; and (2) made a formal request with his employer for reinstatement 180 days after discharge. But the record is devoid of any evidence that plaintiff ever placed a formal request on Baxter for reinstatement after having been honorably discharged from the Armed Forces. He returned from leaves and drills to the same position and salary he had before attending those activities (Docket No. 40-4, p. 154). In consequence, he does not have a valid cause of action under Law 203. Nonetheless, if that action were plausible in this case, it would not stand in light of the grounds for termination evaluated in

---

[76] Taking into consideration this result, there is no need to analyze Baxter's argument at Docket No. 40-1, p. 20, that the Law 62 claim is time-barred.

González-Santiago v. Baxter Healthcare S.A., *et al.*
Civil No. 16-2929 (PAD)
Opinion and Order
Page 68

regard to USERRA. And based on those grounds, the action under Law No. 203 would be dismissed.[77]

### c. **Law 80**

### 1. **General Principles**

Plaintiff alleges that he was wrongfully discharged in violation of Law No. 80 (Docket No. 23 ¶ 51). Law No. 80 makes private-sector employers liable for payment of an indemnity to employees hired for undefined term who are discharged without just cause. See, Article 1 of Law 80, P.R. Laws Ann. tit. 29 § 185a (stating coverage and payment obligation). The statute contains a general definition of just cause and provides guidance on the application of this concept through various examples relating to employee misconduct and performance, and downsizings and shutdowns. See, Article 2 of Law 80, P.R. Laws Ann. tit. 29 § 185b (setting forth general definition and examples).[78]

In this respect, a just discharge is one in which the employer provides a considered, non-arbitrary reason for an employee's termination that bears some relationship to its business' operation. See, Echevarría v. AstraZeneca Pharmaceutical LP, 856 F.3d 119, 140 (1st Cir. 2017)(stating proposition). By contrast, a discharge made by the mere whim of the employer or without cause relative to the proper and normal operation of the establishment is not considered

---

[77] Given this result, it is unnecessary to examine Baxter's argument at Docket No. 40-1, p. 22, that the Law 203 claim is time-barred.

[78] The examples include: (a) a pattern of improper or disorderly conduct by the employee, (b) the attitude of the employee of not performing his work in an efficient manner, or of doing it belatedly and negligently or in violation of the standards of quality of the product produced or handled by the establishment, (c) the employee's repeated violations of the reasonable rules and regulations established for the operation of the establishment, provided a written copy has been opportunely furnished to the employee, and (d) three other grounds related to shutdowns, restructurings, and downsizings. See, Article 2 of Law 80, 29 P.R. Laws § 185b. The examples are not, and are not intended to be, "a code of conduct containing a list of clearly defined offenses with their corresponding penalties for each case, whether it be a reprimand, suspension, or dismissal." Rivera-Cartagena, 802 F.Supp.2d at 348.

just. Id.[79]  If the discharge is considered just, "no discharge indemnity payment is due." Rosado, 2019 WL 7247776 at *12.  In that case, the action must be dismissed.  Id.

## 2. **Evidentiary Framework**

Until the enactment of the Puerto Rico Labor Transformation and Flexibilization Act, Law No. 4 of January 26, 2017 ("LTFA"), plaintiff bore the initial burden of alleging unjustified dismissal and of proving termination.  See, García-García v. Costco Wholesale Corporation, 878 F.3d 411, 420 (1st Cir. 2017)(describing framework).  If this requirement was met, the employer had to come forward with evidence to prove that the discharge was justified.  Id.[80]  In the event the employer did so, plaintiff had to rebut the showing of just cause.  Id.  The LTFA, however, relieved the defendant of the obligation to prove just cause for the discharge.  See, Article 4.12 (amending Article 11 of Law No. 80).[81]  This development raises the issue of whether the amendment has retroactive effect and applies to this case.

In general, laws in Puerto Rico do not have retroactive effect unless they expressly so decree.  See, Article 9 of Civil Code of 2020, Law No. 55 of June 1, 2020 (awaiting incorporation in P.R. Laws Ann.) and Article 3 of previous Code at P.R. Laws Ann. tit. 31 § 3.  The opposite is true for procedural rules, which apply to actions pending at the moment of their effectiveness, unless they expressly state otherwise.  See, Ortiz v. Fernos López, 1976 PR Sup. LEXIS 23484, p.

---

[79] For a detailed and comprehensive discussion of this topic, see Jorge L. Capó-Matos, in M.J. Caterine, Employment at Will: A State-by-State Survey-Puerto Rico Chapter (2011), pp. 936-969, and 2014 Cumulative Supplement, at pp. 40-15-40-22.

[80] The employer's burden to show just cause was part of Article 11 of Law No. 80.  See, Alvarez-Fonseca v. Pepsi Cola of Puerto Rico Bottling Co., 152 F.3d 17, 28 (1st Cir. 1998)(discussing burden).

[81] Notwithstanding the statutory text, in an opinion addressed to the Governor of Puerto Rico, the Secretary of Justice concludes that the employer sill bears the burden of showing just cause under Law No. 80.  See, Advisory Opinion No. A-77-17, pp. 1, 7.  Bearing in mind the result reached below as to the applicability of this provision in the present case, the court need not address whether the statutory text prevails over the Secretary's interpretation.

2, 1976 WL 40149, 104 D.P.R. 851 (1976)("It is a generally accepted principle that the rules of a procedural nature have a retroactive effect [and apply] to the actions pending at the moment of [their] effectiveness as well as to the causes of action filed subsequent to the effectiveness of the same")(internal citations omitted).  The Puerto Rico Supreme Court has referred to burden of proof as procedural.  See, West India Machinery v. Srio. de Hacienda, 1969 PR Sup. LEXIS 106, p. 5 n. 13, 1969 WL 21663, 97 D.P.R. 34 (1969)(noting in context of taxpayer dispute with Secretary of the Treasury, that "[t]he same conclusion is reached whether the ordinary rules of procedure of the burden of proof or those regarding the overcoming of the presumption of correctness of the administrative determination, are applied").

That said, Article 1.2 of LTFA provides that employees hired before the Act's effective date will continue to enjoy the same rights and benefits that they previously had, and plaintiff was hired before such date.  In similar fashion, some of the LTFA's provisions explicitly state that they are inapplicable to employees hired before its effectiveness.  See, Article 4.3 (new cap on severance pay not applicable to employees hired before LTFA's enactment).  But other provisions are silent on retroactivity and shed no light on whether the amendment regarding burden of proof may apply to actions, like the one at bar, that were pending as of the day the LTFA became effective.  In Ramos-Santiago v. WHM Carib, LLC, 919 F.3d 66 (1st Cir. 2019), however, the First Circuit assumed without deciding in the related context of Puerto Rico's general antidiscrimination statute – Law No. 100 – that pre-enactment law applies to Law No. 100 actions pending before the enactment of the LTFA.  Id. at 72 n. 5.  Following the same path, the court assumes that the pre-enactment burden standard, which is more favorable to plaintiff, applies here, and will analyze the Law No. 80 claim accordingly.

From this frame of reference, plaintiff met the initial burden.  At termination, he had been employed for undefined term; there is no controversy that his employment terminated; and as stated in the Amended Complaint, he was "wrongfully discharged" (Docket No. 23, ¶ 51), a phrase the court construes as an allegation that the employment terminated without just cause.  As to Baxter, the Company presented evidence that the decision to terminate plaintiff's employment was based on plaintiff's use of the corporate card for personal expenses and his attempt to cover up the misconduct, lying during the investigation.  Baxter investigated the situation and had an honest, reasonable basis to believe that plaintiff had incurred in immediately terminating offenses.  In this way, it did not decide to terminate plaintiff out of whim.  On the contrary, it put forward considered, serious, non-arbitrary grounds for termination, grounds reasonably linked to Baxter's business.  Therefore, it established just cause for the dismissal.

In this scenario, to withstand summary judgment plaintiff had the burden to rebut Baxter's showing.  To satisfy this burden, plaintiff "was required to do more than cast doubt on the defendant's proffered reason for his discharge."  García-García, 878 F.3d at 421(internal citations omitted).  More on point, because the "just cause" inquiry focuses not on the objective veracity of the employer's action but on the employer's reasonable belief," Echevarría, 856 F.3d at 140, plaintiff had to call attention to probative evidence that Baxter did not genuinely believe in or did not in fact terminate him for the reason given.  Id.

### 3.  **Plaintiff's Rebuttal**[82]

First, as he argued under USERRA, plaintiff states that the Costco incident was a mistake that do not merit termination (Docket No. 42, p. 7).  As mentioned earlier, however, the "just

---

[82] Plaintiff relies in part on arguments the court discussed in response to USERRA.  Even so, they are presented as relevant to the issues connected with Law 80.

cause" inquiry focuses not on the objective veracity of the employer's action but on the employer's reasonable belief.  Thus, plaintiff had to adduce probative evidence that Baxter did not genuinely believe in or did not in fact terminate him for the reason given.  And he did not do so.  There is no genuine dispute of the decisionmakers' honestly held belief that plaintiff deliberately made the Costco purchases and lied about it.  See, Rosado-Mangual v. Xerox Corporation, 2019 WL 7247776, *18 (D.P.R. Dec. 27, 2019)(pointing out in dismissing Law 80 claim that "in the event an employee is discharged based on a complaint lodged by another employee, the focus turns on the extent to which the employer reasonably believed the complaining employee's allegation an acted on it in good faith or, to the contrary, did not believe the co-employee's allegation and used it as a pretext to carry out an otherwise wrongful discharge"); Total System Services, Inc., 221 F.3d at 1176 (employer need only prove "its good faith belief that a false statement was knowingly made").  A perceived violation suffices to establish that "the employer did not terminate the employee on a whim rather than for a sensible business-related reason."  Daumont-Colón, 982 F.3d at 34; García-García, 878 F.3d at 420; Echevarría, 856 F.3d at 140.

Second, as he stated in connection with USERRA, plaintiff asserts that he was terminated in violation of Baxter's own policies and regulations- specifically the P-Card Manual -because to his way of thinking, there was a dispute with a vendor which he resolved having Costco reverse the charge to the P-Card and instead charge his personal credit card (Docket No. 42, pp. 5-6).  In that situation, he claims the Manual does not call for termination.  Id. at pp. 6-7.  But Baxter does not interpret the Manual the way plaintiff does.  Rather, as explained above, it adduces that the dispute procedure plaintiff alludes to applies to transactions the employee did not make that are nonetheless charged to the corporate card (Docket No. 56-1, p. 123).  In those cases, the employee must first attempt to resolve the matter directly with the supplier so as to have the supplier correct

the situation and remove the disputed transaction from the statement.  Id.  The procedure does not,

however, apply where, as here, the employee has in fact used the P-Card for the purchase.  Id.

Baxter is entitled to interpret its policies, and the interpretation it has adopted on this provision is

not unreasonable.  Furthermore, as noted in the context of USERRA, the P-Card Manual also

specifies that use of the corporate card for personal purchases is strictly prohibited; improper use

can result in disciplinary action including termination of employment; and termination of

employment and legal action may be taken in case of fraud (Docket No. 40-10, pp. 5, 12).  And

Baxter has acted consistently with its interpretation, as it has terminated every employee found to

have intentionally used the P-Card for personal gain.

Third, as he expressed with respect to USERRA, plaintiff states that Ms. Centeno did not

verify the P-Card Manual (Docket No. 42, p. 7).  But as the court observed at the time it discussed

the same topic under USERRA, plaintiff's conduct falls squarely within the ambit of the P-Card

Manual as an offense carrying termination irrespective of whether Ms. Centeno checked it out as

part of the decision-making process.  In any case, as mentioned above, a single set of events may

implicate different bodies of policies or rules, and the P-Card Manual was not the only source of

guidance to employee conduct within the Baxter organization.  Baxter's Employee Manual, copy

of which plaintiff received (Docket No. 40-4, pp. 53-54), applied as well.  This Manual includes

within the category of major offenses that may result in termination as a first offense, to rob, steal

or unduly appropriate the property of other employees, vendors, or of the company; falsification

or alteration of documents or files; and refusal to fully cooperate in any investigation carried out

by the company, a category that includes providing false, incorrect or incomplete information or

omitting information regarding the investigative process. (Docket No. 40-26, pp. 2-3).  And based

on the information that the decisionmakers found credible, they fairly concluded that plaintiff's behavior merited termination.

Fourth, plaintiff mentions that even if the P-Card transaction were characterized as a "misuse," considering that this would have been his first offense, Baxter cannot establish that he engaged in a pattern of improper conduct, had an attitude of rendering his work in an inefficient manner, or that he incurred in reiterated violation of rules and regulations, and as a result, should have instead followed the progressive discipline under Law 80 (Docket No. 42, p. 8). In general, Law 80 does not favor dismissal "as penalty for a first offense." Rivera-Cartagena, 802 F.Supp.2d at 348. Yet, it "does not invariably require repeated violations, particularly where an initial offense is so serious, or so reflects upon the employee's character, that the employer reasonably should not be expected to await further occurrences." Hoyos v. Telecorp Communications, Inc., 488 F.3d 1, 6 (1st Cir. 2007). And in this instance, the nature of the offenses provided just cause for immediate termination regardless of whether they were considered a first offense.

Terminations on account of employee fraud, misappropriation of property, and dishonesty are directly related to the employer's proper operation. A civilized society "cannot legitimize a lie or raise it to the rank of virtue." Rosado-Mangual, 2019 WL 7247776 at *23. Lying tends to destroy the employer-employee dynamics and affects the good operation of the company. Id. By the same token, false statements "impair the employer's ability to make sound judgments that may be important to the employer's legal, ethical and economic well-being." Id. In that form, the employer "is entitled to expect and to require truthfulness from its employees in internal investigations." Id. So, an employee can be "properly discharged based on the employer's good faith belief that [ ] he lied in an internal investigation." Total System Services, Inc., 221 F.3d at 1176. Under these circumstances, plaintiff was appropriately terminated. That he may think that

what he did "was not serious enough for termination does not mean that he did not commit the violation or that the violation was not serious." Rosado-Mangual, 2019 WL 7247776 at *23.[83]

Fifth, plaintiff refers to his employment history and work accomplishments (Docket No. 42, p. 5). Evidence of stellar performance "may be used to rebut a termination based on poor performance." Rosado-Mangual, 2019 WL 7247776 at *26. However, that is not the case when termination is predicated on a different ground. See, García-García, 878 F.3d at 421 (rejecting plaintiff's attempt to rely on his history of frequent promotions, high ratings on quality inspections, and high monthly average sales to rebut employer's good-cause showing under Law 80, for the employer did not terminate him for poor performance); Echevarría, 856 F.3d at 137 n. 3 (rejecting argument that plaintiff's history of "stellar performance" had not been considered, as the employer did not seek to justify termination on the ground that plaintiff's performance was deficient); Rosado-Mangual, 2019 WL 7247776 at *26 (that plaintiff received many accolades and multiple salary increases immaterial, given that reason for termination was not poor performance). And here plaintiff was not terminated for poor performance.

Sixth, plaintiff complains that in conducting the pre-termination investigation Ms. Centeno did not involve Ms. Muñoz or interview Luis Lora (Docket No. 42, p. 7).[84] It is undisputed that Ms. Muñoz spoke with Mr. Morán and provided documents and information to him, information

---

[83] See also, Rivera-Cartagena, 802 F.Supp.2d at 348-349 (dismissing Law 80 claim of plaintiff- a manager -terminated for first offense of consuming alcohol during work hours while wearing the employer's uniform, accompanied by his peers, after a business training and before a business meeting, in violation of employer's alcohol and drug policy; that it was plaintiff's first offense and he had not repeatedly violated the employer's rules did not mean he should have been given a second chance, as employer had a zero-tolerance policy against the use of alcohol; as manager, plaintiff was expected to set an example; and it would have been unwise for employer to allow plaintiff a second chance rather than enforcing its policy to discourage any future improper conduct).

[84] Mr. Lora was plaintiff's direct supervisor for around 6½ years (Docket No. 42-3, ¶ 3), including December 2015 when plaintiff purchased the tires (Docket No. 40-15, pp. 3-4). By April 2016, the direct supervisor was Mr. Rodríguez (Docket No. 40-28, p. 2). The termination decision was not consulted with him either. Id. at p. 4.

that he shared with Ms. Centeno.  Regarding Mr. Lora, plaintiff does not explain what value he would have added to the investigation.  His declaration under penalty of perjury states that he told Ms. Centeno after the termination that he opposed the decision because of plaintiff's years of employment, his exemplary performance, and Lora's view that the P-Card Guideline provided for a different course of action (Docket No. 42-2, ¶ 5).  Yet neither length of employment nor performance was an issue here.

As for Mr. Lora's opinion about the P-Card, his declaration does not proffer facts in support of the opinion.  In the same way, it is silent about the evidence that the investigators and decisionmakers examined and found credible; the fact that Baxter has terminated all employees found to have intentionally used the corporate card for personal gain; and plaintiff's dishonesty.  Thus, what Mr. Lora has asserted does not undermine the factual scenario the decisionmakers based their decision on.  Considering this state of affairs, the discharge did not result from the mere whim of the employer or for legally prohibited reasons, but for reasons linked to the proper and normal operation of the business.  That is why the Law No. 80 claim must be dismissed.

### d.  Law 100

Plaintiff alleges Baxter violated Law 100, and that Mr. Rodríguez was an employer subject to individual liability under this statute (Docket No. 23, ¶¶ 16, 49).  Law 100 prohibits discrimination in employment because of, *inter alia*, membership or former membership in the U.S. Armed Forces.  See, P.R. Laws Ann. tit. 29 § 146 (codifying prohibition and laying out remedies for violation).  Individuals, not only employers proper, may be found liable in connection with Law 100. See, Villamía v. MVP Auto Corp., 433 F.Supp.3d 261, 269-272 (D.P.R. 2020)(addressing topic).  This, however, was not always the case.

González-Santiago v. Baxter Healthcare S.A., *et al.*
Civil No. 16-2929 (PAD)
Opinion and Order
Page 77

### 1. Individual Liability

Until the Puerto Rico's Supreme Court's decision in Rosario-Toledo v. Distribuidora Kikuet, Inc., 151 D.P.R. 634 (2000)(English translation included in Appendix II), most courts in this District had held that individual liability could not be imposed under Law 100. See, Bonilla-Ramírez v. MVM, Inc., 2016 WL 2992106, *4 (D.P.R. May 23, 2016)(so noting). Yet Kikuet held that a supervisor in a sexual harassment action brought under Law 100 (Puerto Rico's general antidiscrimination statute), Law 69 of July 6, 1985, P.R. Laws Ann. tit. 29 §§ 1321 et seq. (enacted to specifically prohibit gender discrimination in the workplace), and Law 17 of April 22, 1988, P.R. Laws Ann. titl.29 §§ 155 et seq. (enacted to strengthen the prohibition against sexual harassment in the workplace), could be sued in his individual capacity. See, Bonilla-Ramírez, 2016 WL 2992106 at *4 (discussing issue). Kikuet was somewhat ambiguous on whether its holding opened the door to impose liability under Law 100 for acts other than sexual harassment. Id. at *4 (explaining ambiguity). But because it did not expressly limit the holding to sexual harassment, the consensus among courts in this District was that after Kikuet, Law 100 "should be read to recognize individual liability in all instances of discrimination covered by the statute." Id.

A number of years after Kikuet, the Puerto Rico Supreme Court concluded in Santiago Nieves v. Braulio Agosto Motors, 197 D.P.R. 369 (2017)(English translation included in Appendix III), that individual liability may not be imposed for retaliation in actions instituted under Law 115 (Puerto Rico's general anti-retaliation statute). See, Appendix III, pp. 5-6 (holding that there is no action against an employer's agents in their individual capacity under Law 115). The Supreme Court distinguished Kikuet, observing, among other things, that the decision was based on Article 11 of Law 17, which provides that any person responsible for sexual harassment in the workplace as defined in the statute shall incur in civil liability, such that civil liability is not limited to the

employer "but extend[s] to any person responsible for the conduct in question." Id. at p. 6. The Supreme Court also noted that Kikuet "did not detail counterpart articles to reach that same conclusion" with respect to Law 69 and Law 100. Id.

More recently, in Caballer v. Nidea Corporation, 200 D.P.R. 120 (2018)(English translation included in Appendix IV), the Supreme Court held that individual liability is not available for retaliation actions under Law 17 and Law 69. See, Appendix IV, p. 6 (pointing out that there is no cause for personal action against the employer's agents and supervisors for acts of retaliation under Law 17 and Law 69). To that end, the Supreme Court asserted that Kikuet rested in part "on an extensive interpretation" of language in Article 11 of Law 17 (referred to earlier), and further expressed that it had not been "necessary … to perform an analysis regarding the other prohibitions established by the different articles of [Law] 17." Id. at 5. The Supreme Court observed that this was so, because the particular facts of Kikuet dealt "exclusively" with sexual harassment." Id. Additionally, the Supreme Court stated that Kikuet did not hold that this "extensive interpretation" applied in the same way to the provision about retaliation in Law 17, and that to properly apply the rules of Kikuet in a case under Law 69 and Law 17, it is necessary to distinguish between acts of sexual harassment and acts of retaliation. Id.

Elaborating on this distinction, the Puerto Rico Supreme Court mentioned that in sexual harassment, the author is always the one who performs the acts but that in contrast, "acts of retaliation always constitute actions committed by the employer as employer (actual employer)," such that when it comes down to retaliation, "a supervisor, officer, administrator or agent carries out actions under the power conferred upon him by the actual employer," making the "actual employer" the only author of acts of reprisal, as those acts "are his, regardless of who carried them

out on this behalf or by following his instructions."  Appendix IV, p. 6.  Thus, "the responsible

subject varies depending on the proscribed behavior."  Id. at 5.

Applying this reasoning, a sister court in this District recently concluded that individual

liability under Law 100 may be imposed for acts like harassment, which involve something that

any person can engage in regardless of the degree of control or authority the individual holds

within the employer organization, but not for acts that correspond to the employer and can only be

committed by it, such as demotions and dismissals.  See, Villamía, 433 F.Supp.3d at 272 (so

holding).  The court finds this holding persuasive, as it takes into account the Puerto Rico Supreme

Court's most recent, post-Kikuet interpretations on the subject of individual as opposed to

exclusive employer liability arising out of employment-related statutes.  So, in general, except for

acts of harassment, liability under Law 100 only attaches to the employing entity itself, which in

turn must respond for the acts and omissions of its agents and supervisors.  And considering the

evidence that has been presented, Mr. Rodríguez cannot be held liable under Law 100.  As

explained above, no actionable harassment occurred here, much less actionable harassment

traceable to him.

## 2.  Methodology

Beyond harassment, until the enactment of the LTFA in 2017, in the absence of direct

evidence of discrimination a plaintiff could rely on circumstantial evidence through the "just

cause" framework set in Article 3 of the statute.  At its core, the framework consisted of three

stages: (1) a *prima facie* case; (2) burden shifting; and (3) ultimate demonstration of

discrimination.  See, Caraballo-Cecilio v. Marina PDR Tallyman LLC, 2016 WL 6068117, *2

(D.P.R. Oct. 13, 2016)(describing framework).

A plaintiff established a *prima facie* case by demonstrating that: (1) he suffered an adverse employment action; (2) the adverse action lacked just cause; and (3) some basic fact substantiating the type of discrimination alleged.  See, Rodríguez v. Executive Airlines, Inc., 180 F.Supp.3d 129, 132-133 (D.P.R. 2016)(setting forth elements of *prima facie* case under Law No. 100); Varela-Teron v. Banco Santander de Puerto Rico, 257 F.Supp.2d 454, 466 (D.P.R.2003)(same).  A *prima facie* showing activated a presumption that the plaintiff was the victim of discrimination.  See, García-García, 878 F.3d at 423 (pointing out effect of presumption); Ramos v. Davis & Geck, Inc., 167 F.3d 727 (1st Cir. 1999)(same).  The presumption originated in Article 3 of Law No. 100.  See, P.R. Laws Ann. tit. 29 § 148 (codifying presumption).  The term "just cause" was construed by reference to Law 80.  See, Rodríguez, 180 F.Supp.3d at 133 (so recognizing).

The employer could rebut the presumption proving legitimate, non-discriminatory grounds for the challenged action.  See, De Arteaga v. Pall Ultrafine Filtration Corp., 862 F.2d 940, 941 (1st Cir. 1988)(noting that once activated, the presumption required employer to prove that the action in question was not discriminatory); Ramos-Santiago v. WHM Carib, LLC, 2017 WL 1025784, *6 (D.P.R. March 14, 2017)(describing among other things, how employer could rebut the presumption).  Like under the USERRA, the burden was one of production and of persuasion.  See, García-García, 878 F.3d at 423 (explaining the Law No. 100 burden).  If the employer satisfied this burden, the presumption of discrimination "disappeared," shifting to the employee the burden of proof on the ultimate issue of discrimination, meaning that he had to prove that the reasons proffered for the termination were a pretext specifically designed to mask the asserted discrimination.  Id.  The same burden persisted in cases where the presumption was not triggered, as in those instances the employee also had the burden of proof on the final issue of discrimination.  Id. at 424 n. 22.

González-Santiago v. Baxter Healthcare S.A., *et al.*
Civil No. 16-2929 (PAD)
Opinion and Order
Page 81

Nevertheless, the LTFA amended Article 3 of Law 100, eliminating the presumption.  See, Article 6.3 of LTFA (amending Article 3 of Law 100).  Statements from the Puerto Rico Supreme Court suggest that it views presumptions in general and the Law 100 presumption in particular as procedural.  See, Ramírez Ferrer v. Conagra Foods PR, 175 D.P.R. 799, 815 (2009)(referring to procedural framework of presumption established in Article 3 of Law No. 100);[85] West India Machinery, 97 D.P.R. at 44, n.13 (characterizing presumption of correctness of administrative determination as a rule of procedure).  As mentioned earlier, changes to procedural rules generally have retroactive effect and apply to actions pending at the moment of their effectiveness.  The LTFA is unclear about how the amendment in question should be treated.  But as noted above, in Ramos-Santiago, 919 F.3d at 72 n. 5, the First Circuit assumed without deciding, that pre-enactment law applies to Law 100 actions pending before the enactment of the LTFA.  On that assumption, the court evaluates the Law 100 claim under the pre-LTFA just-cause presumption framework, which is more favorable to plaintiffs than the one resulting from the LTFA.

**3.  Analysis**

As discussed in relation to Law 80, Baxter demonstrated just cause to terminate plaintiff's employment, from which follows that the presumption was not set in motion.  So, in accordance with García-García, the case moves one step further, for plaintiff to try to demonstrate that the reasons proffered for termination are a pretext to cover up military animus.  Under USERRA, Baxter showed that its decision was not pretextual, and plaintiff failed to undermine that showing.  And here he has not come up with affirmative evidence of pretext to sustain a Law No. 100 claim either.  Because of this, the Law 100 claim must be dismissed.  See, Hart v. Township of Hillside,

---

[85] Court's translation for "esquema procesal de la presunción establecida en el Art. 3 de … Ley Núm. 100 …" Ramírez Ferrer, 175 D.P.R. at 815.

González-Santiago v. Baxter Healthcare S.A., et al.
Civil No. 16-2929 (PAD)
Opinion and Order
Page 82

228 Fed.Appx. 159, 163-164 (3d Cir. 2007)(dismissing USERRA claim and reaching the same result as to claim under state discrimination statute, which prohibited employers from discriminating against employees or prospective employees because of service in the armed forces of the United States).[86]

### e.  Law 115

Plaintiff alleges that Baxter retaliated against him in violation of Law 115 (Docket No. 46, p. 14).  Law 115 makes it unlawful for an employer to discharge, threaten, or discriminate against: (1) an employee who has offered or attempted to offer testimony, expression or information before a legislative, administrative or judicial forum in Puerto Rico; and (2) an employee who has provided or attempted to provide testimony, expression or information in internal procedures the company has established or before any employee or representative in a position of authority, provided the expression is not of a defamatory character or constitutes disclosure of privileged information established by law.  See, P.R. Laws Ann. tit. 29 § 194a(a) (so providing).  The second proviso was inserted in the statute by way of Law No. 169 of September 29, 2014 (English translation included in Appendix V).  Prior to the enactment, it did not enter into the retaliation calculus under Law 115.  See, Cabrera v. Sears Roebuck de Puerto Rico, Inc., 2009 WL 2461688, *9 (D.P.R. Aug. 10, 2009)(pre- 2014 amendment decision to the effect that Law 115 did not prohibit retaliation in response to internal complaints).

Absent direct evidence of retaliation – and there is none here – to set out a *prima facie* case under the statute, a plaintiff must show that he: (1) participated in an activity protected by Law

---

[86] See also, Velázquez-Fernández v. NCE Foods, Inc., 476 F.3d 6, 11 (1st Cir. 2007)(summary judgment dismissing claims under both the Age Discrimination in Employment Act and Law 100 for lack of evidence to infer that employer's justification was a pretext for discrimination); García-García, 878 F.3d at 424 (same with regards to gender discrimination under Law 100).

115; and (2) was subsequently discharged or otherwise discriminated against.  See, Collazo v. Bristol-Myers Squibb Mfg., Inc., 617 F.3d 39, 45 (1st Cir. 2010)(articulating test).  If the plaintiff puts together this showing, the employer must articulate a "legitimate reason" for the challenged action.  Rivera-Rodríguez v. Sears Roebuck de Puerto Rico, Inc., 367 F.Supp.2d 216, 230 (D.P.R. 2005).  Should the employer do so, the plaintiff bears the burden of demonstrating that the reason asserted for the action is a pretext for retaliation.  Id.  From these parameters, plaintiff contends that Baxter infringed Law 115 because it terminated him after he participated in a military drill on April 9, 2016 (Docket No. 2929, p. 14).  Additionally, he mentions that he filed a claim before the Puerto Rico Antidiscrimination Unit.  Id.

First, plaintiff has not cited - and the court has not found - any legal authority in support of the proposition that by participating in a military drill, a person has "offered or attempted to offer" testimony, expression or information "before a legislative, administrative or judicial" body in Puerto Rico.  See, Lupu v. Wyndham El Conquistador Resort & Golden Door Spa, 524 F.3d 312, 313 (1st Cir. 2008)(dismissing Law No. 115 claim for lack of *prima facie* case insofar as employee did not offer or attempt to offer testimony to any of the governmental authorities listed in the statute by discussing concerns with supervisor about hotel's possible noncompliance with government regulations and unintentionally leaving on supervisor's desk a document listing questions to ask attorney about his rights if he went to government authorities); Collazo, 617 F.3d at 45 (same result as to employee who asked company for technical documents in preparation for an upcoming FDA preapproval inspection); Hoyos, 488 F.3d at 6 n. 3(observing that Law 115 "prevents discrimination against individuals for testifying").

Second, by plaintiff's account he informed Mr. Rodríguez that he would be attending a military drill on April 9 and 10, 2016.  Mr. Rodríguez was in a position of authority, and although

he denied plaintiff's version, in evaluating summary judgment submissions the court must accept plaintiff's side of these conflicting accounts. The Statement of Motives of Law 169 explains that in amending Law 115 to incorporate the second proviso, the Legislature sought to protect testimony, expression or information provided in internal processes – internal private employer forums – and to extend to the employees in those situations the same measure of protection accorded employees who provide testimony and information to vindicate their rights before judicial, legislative or administrative fora in Puerto Rico. See, Appendix V, pp. 1-3.[87] Taking plaintiff's version at face value, however, he has not asserted that he was participating in a company procedure geared towards vindicating rights when he informed Mr. Rodríguez of the drill. On this premise, the communication he has referred to lies beyond the protective scope of Law 115 and does not work to sustain the claim. See, Serrano, 2014 WL 4924434 at *12 ("A plaintiff must engage in statutorily protected activity before an employer can retaliate against her for engaging in that activity").

Third, assuming, *arguendo*, that a military drill qualifies as protected activity within the meaning of Law 115 or that merely informing a company employee in a position of authority about participation in an upcoming drill qualifies as such, the record is clear that, as discussed earlier in

---

[87] On this topic, the Statement of Motives expresses that "workplace retaliation can occur in two (2) ways: (1) when an employee appears before a legislative, administrative, or judicial forum to report any practice by the employer, or (2) when an employee resorts to an employee or official in his workplace to file a complaint. In both cases, the employee is at risk of workplace retaliation. According to the current rule of law, the law only protects employees in some cases but not in others "(Appendix V, pp. 1-2). Further, it declares that Law 115 "has a major deficiency: it only protects an employee when said employee offers information or testifies before administrative, legislative, or judicial forums as provided in the statute." Id. at 2. Likewise, it states that this "creates an inequality when applying [Law 115] to the employees of public instrumentalities that operate as if they were private and to those of private entities. For example, an employee of the Highways and Transportation Authority who files an internal complaint with the Office of Labor Affairs shall be protected; however, that is not the case for an employee of ABC, Inc. who files a complaint with the Office of Human Resources and is subsequently discharged. Id. at 3. To that end, the Legislative Assembly considered that the objectives of Law 115 would be "furthered by extending its protection to testimonies, statements, or information offered by an employee during internal procedures of the company where he works," and amended Law 115 accordingly. Id.

González-Santiago v. Baxter Healthcare S.A., *et al.*
Civil No. 16-2929 (PAD)
Opinion and Order
Page 85

light of USERRA, plaintiff was not retaliated or discriminated against for attending the drill.

Whatever may be said about the communication to Mr. Rodríguez, the decisionmakers were not

aware of it.  Nor were they cognizant that plaintiff had attended the drill when they decided to

terminate his employment.  Further, the grounds that Baxter has relied on to explain and justify its

decision stand unrebutted, a fatal gap in plaintiff's case under Law 115.  See, Vega-Colón, 625

F.3d at 34, n. 10 (noting that because the plaintiff's burden under Law 115 is more stringent than

under USERRA and the employee failed to establish a USERRA violation, he could not establish

a Law 115 violation); Escher, 627 F.3d at 1031-1032 (dismissing state retaliation claim observing

that "[f]or the same reasons [plaintiff] cannot make out a USERRA retaliation claim … [he] cannot

make out a common law retaliation claim").[88]

Fourth, plaintiff filed the claim with the Antidiscrimination Unit on April 21, 2016, after

his employment terminated on April 15, 2016.  Because the termination took place before he filed

that claim, he cannot establish that he was "subsequently discharged or otherwise discriminated

against" on the basis of that activity.  Collazo, 617 F.3d at 45.  To rule otherwise would be to put

---

[88] Parenthetically, except for the 2007 overpayment incident that in turn resulted in a payment plan satisfactory to plaintiff, there is no evidence that he ever complained to his superiors, Baxter's Human Resources Department or anybody else in the organization about adverse treatment because of his military status or activities.  This said, as described, the 2007 incident may qualify as protected activity under Law 115.  But as discussed above in regard to USERRA, it did not carry any adverse employment action, an unsurmountable obstacle to liability under USERRA, and in this context, to liability under Law 115.  To boot, any action arising out of that incident would be time barred, and as things go, in view of when it happened, could not lead to liability in light of the statute.  First, Law 115 claims are subject to a three-year limitations period.  See, P.R. Laws Ann. tit. 29 § 194a(b)("Any person claiming a violation of [Law 115] may prosecute a civil action against the employer withing three (3) years from the date in which the violation took place …"); Ramírez v. Pereira, 2009 WL 10681025, *12 (D.P.R. Aug. 31, 2009)(noting that Law 115 claims are subject to a three-year statute of limitations).  As the overpayment incident occurred in 2007, plaintiff would have had until 2010 to complain under this statute.  Because he did not do so, at this juncture any such action would be untimely.  Second, the untimeliness inquiry assumes the statute recognized the action at the time of its occurrence.  However, it did not, for it was only in 2014 that Law 115 was amended by Law 169, to recognize as protected activity internal claims or grievances.  Yet by its terms, the amendment had prospective effect.  See, Article 4 of Law 169 (this law shall be in effect upon its enactment).  In the end, it did not apply to incidents occurring before that date in 2014.

the cart before the horse.  See, Bonilla-Ramírez v. MVM, Inc., 904 F.3d 88, 96 (1st Cir. 2018)(("[Plaintiff] points … to [defendant's] July 10 citation stripping her of her security badge and reassigning her to a non-airport facility.  Notably, however, her protected decision to file her EEOC complaint occurred after July 10.  Thus, [defendant's] decision to strip her of her security badge and to reassign her could not have been retaliation for that protected conduct")(emphasis in original); Echevarria, 133 F.Supp.3d at 400 ("At its core, retaliation may be viewed as a modality of vengeance on account of a prior event, to punish someone because of it").

Fifth, the grounds Baxter relied on to terminate plaintiff's employment would compel dismissal even if he had filed and notified to Baxter the Antidiscrimination Unit charge before termination and the decisionmakers had been on notice that he did so; or if they had been aware that plaintiff informed Mr. Rodríguez that he would be attending a military drill on April 9th or 10th.  Mere knowledge on the part of an employer that an employee it is about to fire has complained or filed a discrimination charge is not sufficient evidence of retaliation to counter substantial evidence of legitimate reasons for discharging the employee.  See, Jenkins v. City of Charlotte, 2007 WL 1199180, *13 (W.D.N.C. Apr. 20, 2007)(applying proposition).  Therefore, the Law 115 claim must be dismissed.

## IV.   CONCLUSION

Viewing the record in light most favorable to plaintiff and drawing all reasonable inferences in his favor, he did not provide sufficient evidentiary support from which a jury could reasonably render a verdict for him on any of the claims.  With that in mind, the court GRANTED defendants' motion for summary judgment and DENIED plaintiff's motion for partial summary judgment.  On the same grounds, the case must be, and is hereby DISMISSED.  Judgment shall be entered accordingly.

González-Santiago v. Baxter Healthcare S.A., *et al.*
Civil No. 16-2929 (PAD)
Opinion and Order
Page 87

**SO ORDERED.**

In San Juan, Puerto Rico, this 29th day of March, 2021.

s/Pedro A. Delgado-Hernández
PEDRO A. DELGADO-HERNÁNDEZ
United States District Judge